775 P.2d 599

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Richard A. LEAVITT,
Defendant–Appellant.**

**Richard A. LEAVITT,
Petitioner–Appellant,**

v.

**STATE of Idaho, Respondent.**

Nos. 16305, 16987.

Supreme Court of Idaho.

May 30, 1989.

David N. Parmenter, Blackfoot, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen. (argued) for respondent.

SHEPARD, Justice.

This is an appeal from a conviction of first degree murder and a subsequent death sentence. We affirm the conviction of first degree murder, but reverse and remand for further consideration the imposition of the death penalty.

Sometime about July 18, 1984, the victim was brutally attacked in her bed. She suffered up to fifteen separate slash and stab wounds, some of which proved fatal. Her body had been further brutalized by the slashing removal of her sexual organs. The body of the victim was not discovered until three or four days following the killing. It is clear that the killing took place on the victim's waterbed which was punctured and torn by the attacker's knife. The combination of the body decomposition, together with the mixture of body fluids and the waterbed liquid, made impossible any determination of rape as a motive for the killing.

The defendant and the victim were both residents of the city of Blackfoot and knew each other. The victim had reported a prowling incident on the night of July 16, 1984, in which she advised the police that the prowler, thought to be the defendant, had tried to enter her home. During the incident the intruder had cut a window screen on the victim's home.

During the interim between the murder and its discovery, the defendant had contacted friends of the victim and also the police, expressing curiosity as to the victim's whereabouts. He claimed that co-workers and the employer of the victim had called him after she failed to appear at work. No such callers were ever located. After the murder and before the body was discovered, the Blackfoot police received two telephone calls stating facts thought to be capable of being only known to the murderer. The caller gave the name "Mike Jenkins" but no person by the name has ever been located. The prosecution asserts that logically the defendant was the only person who could have made the calls because of his detailed knowledge. On July 21 the defendant obtained permission from the victim's parents to enter the home which had been locked and apparently unattended. With the help of the Blackfoot police, entry was made into the house and the body discovered.

The evidence pointing to the defendant as the murderer was largely circumstantial in nature. The defendant sustained a serious incise wound to his left index finger, and on the night of July 18, 1984, he was treated for that wound at the emergency room of the Bingham Memorial Hospital. Blood samples were gathered from the scene of the crime, and serology tests showed that two distinct blood types were present. The victim's blood was type A,

and tests of the blood samples from the crime scene reveal that type O blood had been deposited contemporaneously with that of the victim's type A blood. The blood of sixteen suspects was tested and it was the serologist's opinion that the defendant was the only likely source of the type O blood. The defendant initially denied that his blood could be in the victim's bedroom, but later changed his story to admit he had been in the victim's bedroom and suffered a nosebleed, but contended the incident had happened one week prior to the murder. No explanation could be offered as to how his blood became mixed with that of the victim. The defendant asserted that he had cut his finger while in his own home attempting to upright a toppled fan. Laboratory tests of the Leavitt fan concluded that it lacked any blood residue or any indication it had been recently cleaned, and furthermore tests conducted with the fan were unable to duplicate the type of wound on Leavitt's finger. That "fan explanation" was abandoned by the defendant for the first time at trial wherein he admitted that he and his wife had perjured themselves and stated that the injury in fact had been sustained while he was attempting to prevent his wife from attempting suicide.

While confined in jail, the defendant wrote a letter to his wife containing specific instructions involving her future testimony. That letter was discovered and confiscated during a routine inspection of the jail. At trial the court ruled that the letter had been properly seized and it was used for impeachment purposes during the testimony of the defendant's wife, and further used to impeach defendant's testimony as inconsistent statements.

At trial two witnesses testified to events offered to show the defendant's alleged morbid sexual curiosity, and his frequent possession and use of knives. The defendant's former wife testified that Leavitt had been observed excising and then playing with the female sexual organs of a deer. It was noted that the killer of the victim here had similarly mutilated the body by removing sexual organs from it during the fatal attack. The former mistress of the defendant testified that the defendant displayed a hunting knife prior to their engaging in sexual intercourse, which testimony suggested that the defendant used knives to increase his satisfaction during sexual intercourse.

Since the instant case involves a conviction of first degree murder and the imposition of the death penalty, we have carefully reviewed the record for any indication of prejudicial error occurring at trial, regardless of whether or not error has been specifically asserted by the defendant.

It is first asserted that the defendant was denied his right to a fair trial because of the extensive pretrial publicity given to the murder. We agree that Blackfoot is a relatively small community in which there would be wide knowledge of such a brutal murder, and that the crime in fact was widely reported. The defendant broadly asserts that a change in venue must be granted whenever there is widespread publicity regarding a crime. We disagree. The applicable rule has been outlined by this Court in *State v. Needs*, 99 Idaho 883, 890, 591 P.2d 130 (1979):

Among the factors which this Court will consider in determining whether the criminal defendant actually received a fair trial are affidavits indicating prejudice or an absence of prejudice in the community where the defendant was tried, testimony of the jurors at voir dire as to whether they had formed an opinion of the defendant's guilt or innocence based upon adverse pretrial publicity, whether the defendant challenged for cause any of the jurors finally selected, and the nature and content of the pretrial publicity, and the amount of time elapsed from the time of the pretrial publicity to the trial itself. (citation omitted). Publicity by itself does not require a change of venue.

99 Idaho at 890, 591 P.2d 130.

We have examined the trial court record and conclude therefrom that the pretrial publicity had little if any effect on the potential jurors, and find no indication that potential jurors would prejudge the case.

We further note that the record indicates that the defendant failed to object to the jury panel actually seated at trial.

■ The defendant asserts that his right to a fair trial may have been compromised by the presence of one member of the jury. Late in the trial defendant's counsel moved to reopen jury voir dire to examine an individual juror with regard to alleged statements by the juror prior to trial. The motion was denied. Defendant does not assert there was any evidence that the juror had formed an opinion as to defendant's guilt or innocence. During voir dire that juror had been examined and specifically stated, "anything that I have heard can be put off." Defendant's assertions are vague and uncertain, and we conclude that the trial court did not abuse its discretion in denying defendant's motion for additional voir dire following the seating of the juror. *State v. Sanger*, 108 Idaho 910, 702 P.2d 1370 (Ct.App.1985). This Court in *State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979), stated, "[i]t was not incumbent upon the trial judge to find jurors who were totally ignorant of the facts and issues involved in this case." We find no indication in the record of any prejudice.

■ The defendant next asserts that alleged exculpatory evidence was not disclosed to the defendant. That "exculpatory" evidence related to a Blackfoot police dispatcher who had received the "Mike Jenkins" telephone calls. Following voice comparison tests the telephone dispatcher was unable to clearly identify Leavitt as the Mike Jenkins caller. The defendant argues that his rights to a fair trial and due process were prejudiced because the prosecution failed to disclose the inability of the police dispatcher to identify the voice of the caller. Defense counsel moved to reopen defendant's case-in-chief to require the dispatcher to testify as to her alleged opinion of the voice comparisons. The trial court denied defendant's motion on the grounds that the alleged testimony would be a subject for expert testimony. Prior to trial the police dispatcher had made a voice comparison of the "Mike Jenkins" calls, and the defendant's voice as observed dur-

ing his confinement. The dispatcher had prior to trial given the opinion that she thought the defendant and Mike Jenkins were one and the same person, but that she could not be sure. Therefore, the prosecution did not solicit her opinion at the time of trial. We cannot conclude that the testimony, if required, could be other than inculpatory of the defendant, and the prosecution did not fail to disclose exculpatory evidence. We do not necessarily agree with the trial court if its ruling was based on a perception that only expert witnesses are competent to identify the voices of telephone callers. *See State v. Fenley*, 103 Idaho 199, 646 P.2d 441 (Ct.App.1982); I.R.E. 701. Nevertheless, we view the error, if any, to be harmless since the purported identity of the caller was not placed before the jury, and the testimony of the telephone dispatcher could only have been prejudicial to some extent to the defendant's case.

■ The defendant next asserts that the prosecution failed to preserve or disclose certain evidence and hence the defendant's right to due process was violated. It is also asserted that the trial court erred when it denied defendant's motion to exclude the prosecution's evidence of blood sample tests. Defendant argues that had additional blood samples been preserved, tests could have shown that the samples of his blood found in the victim's bedroom were in fact deposited at an earlier time than the victim's blood was deposited. In addition, he asserts that evidence tended to show that the body of the victim may have been mutilated by the cat of the victim. In all, defendant argues that he was denied the opportunity to perform various tests on the corpse of the victim prior to the time it was cremated. Those assertions of the defendant must be considered in the light of other evidence presented at trial. An expert serologist testified that tests showed convincingly that the blood samples had been mixed, thus supporting the conclusion that the two types of blood had been deposited contemporaneously. The pathologist testified extensively regarding the condition of the corpse at the time of the exami-

nation. There is no doubt as to the cause of death, and the nature of the victim's injuries. We do not accept the bare assertion of the defendant that additional blood samples may somehow have been exculpatory. It is incumbent upon a defendant to demonstrate such exculpatory value. *United States v. Scott*, 789 F.2d 795 (9th Cir.1986). As to the preservation of the corpse, there is no showing of any evidence to be gained therefrom, and the State has no duty to preserve such. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The appellant next argues that the trial court erred in refusing to suppress the testimony of State witness Wycoff. It is argued that the testimony of Wycoff had not been disclosed to the defense prior to trial. The Wycoff testimony involved his experiment to determine whether a particular type of knife may have been used in the slashing of the waterbed sheet found in the victim's home. It is asserted that defendant's preparation for trial was prejudiced by the non-disclosure of the Wycoff testimony prior to trial. The record is clear that the experiment conducted by witness Wycoff did not take place until the course of the trial, and hence no disclosure of that testimony prior to trial was possible. Hence, the pretrial disclosure rules are not applicable. *State v. Mosley*, 119 Ariz. 393, 581 P.2d 238 (1978); *see also State v. Gerdau*, 96 Idaho 516, 531 P.2d 1161 (1975). Additionally, even assuming that pretrial disclosure rules somehow do apply, there must be a showing that the late disclosure denied a defendant a fair trial. *State v. Smoot*, 99 Idaho 855, 590 P.2d 1001 (1978). Here defendant has made no such showing.

■ The defendant next asserts that the trial court erred in three evidentiary rulings. The defendant first asserts that error was committed when certain color photographs of the victim's corpse in an advanced state of decomposition, were admitted in evidence. Defendant cites *State v. Martinez*, 92 Idaho 183, 439 P.2d 691 (1968) as authority for his assertion of error. Therein the Court dealt with the need to balance the probative value and relevance of such evidence against resulting prejudice to the defendant. We agree with the *Martinez* balancing rule. However, in the instant case, although the photographs were admittedly gruesome in nature, clearly they were necessary to show the nature of the crime and the type of wounds inflicted upon the body. The jury is entitled to have an accurate picture of all the circumstances, and although such information may be gruesome in nature it is necessary to make an intelligent fact finding decision. *State v. Izatt*, 96 Idaho 667, 534 P.2d 1107 (1975). Since the photographic evidence is relevant, there is no objection on the basis that it could be presented in a somewhat less graphic form. The State is not obligated to present evidence which has a lesser impact. *State v. Rollo*, 221 Or. 428, 351 P.2d 422 (1960).

■ The defendant next contends that the court erred in permitting certain testimony by the defendant's former wife. The trial court permitted that witness to testify to defendant's activities while on hunting trips in removing the sexual organs of game animals. That testimony was admitted on the basis that it was relevant because of the mutilation and removal of the sexual organs of the victim. Defendant argues that I.R.E. 403 required exclusion of that evidence because its probative value is greatly outweighed by its prejudice and tendency to inflame the jury. We disagree. The fact that certain evidence is horrifying and gruesome, is not in and of itself sufficient reason for exclusion. In the instant case the corpse of the victim had been brutalized by the removal of her sexual organs by a person who clearly had certain anatomical knowledge. That evidence tended to indicate that the defendant had a morbid and sadistic interest in sexual organs, had a knowledge of anatomy, a possible motive for the crime, and a modus operandi which tended to identify the defendant as the killer. Certainly that evidence was prejudicial to the defendant, however, almost all evidence in a criminal trial is demonstrably admitted to prove the case of the state, and thus results in prejudice to a defendant. The evidence was

probative and the trial court did not err in its ruling as to its admissibility.

■ It is next asserted that the trial court, in the face of a marital privilege objection, erred in admitting a document obtained from the defendant while he was housed in the county jail. We find no circumstances demonstrating any relevance to marital privilege. Leavitt denied that the document constituted a letter to his wife, and denied any intent to deliver the document to his wife. Rule 405(b) only addresses compelled testimony from a spouse of a privileged communication. Hence, no marital privilege is applicable. Likewise, we find no work product privilege. The document was confiscated during a routinely conducted protective search of jailhouse inmates entering and exiting the facility. Lastly, it is argued that no proper foundation was laid for the admissibility of the document. The State argued admissibility on the basis that the document contained an account of the facts conflicting with that attested to by the defendant under oath. Accordingly, the document was admissible for impeachment purposes. If the facts stated in the document were correct, then clearly the defendant had perjured himself during his testimony. Thus, the document was admissible to impeach the defendant's testimony.

■ Following trial and conviction, defendant filed his motion for a new trial on the basis that newly discovered evidence indicated a possible mental disease of the defendant. Defendant asserts that such possible mental disease or deficiency may show his inability to premeditate and form any intent to commit murder. A motion for a new trial is directed to the sound discretion of the trial court, and its decision thereon will not be disturbed absent an abuse of discretion. A motion for a new trial based on newly discovered evidence must satisfy the following test: 1) that the evidence is newly discovered and unknown to the defendant at the time of trial; 2) that the evidence is material and not merely cumulative or impeaching; 3) that it will probably produce an acquittal; and 4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant. *State v. Ames,* 112 Idaho 144, 730 P.2d 1064 (Ct.App.1986).

■ The motion for a new trial was denied by the trial court on the basis that the asserted newly discovered evidence was not material. We agree. During all of the original trial proceedings the defendant denied involvement with the killing of the victim. That is a completely different defense than one now asserted which admits the criminal act, but denies culpability on the ground of inability to form the requisite intent. Further, the proffered psychological tests [which were considered by the trial court] indicate that the defendant purportedly suffers from anti-social personality disorder and an intermittent explosive disorder. There is no indication in the proffered evidence that either of those illnesses would have prevented the defendant from forming the requisite intent to murder.

■ The defendant next contends that he was denied his sixth amendment constitutional right to effective assistance of counsel. All of defendant's asserted deficiencies of counsel deal with disagreements with strategic judgments of his trial counsel. We held in *Estes v. State,* 111 Idaho 430, 725 P.2d 135 (1986), that such judgments of trial counsel will not be disturbed unless found to be objectively unsound. *See also Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We have reviewed the record as a whole, and it is clear that in the exercise of trial strategy, defense counsel did not always follow defendant's requests. We find no error. Indeed, as acknowledged in defendant's brief on this appeal, trial counsel refused to call two police officers as witnesses for the defense, but only because of counsel's knowledge that their testimony would have been prejudicial to the defendant, and would have made a poor impression on the jury. Even if some of counsel's decisions at trial were erroneous, they must have been so serious as to deprive the defendant of a fair trial. *Paradis v. State,* 110 Idaho 534, 716 P.2d 1306 (1986). We hold defendant was not denied effective assistance of counsel.

■ The defendant next asserts prosecutorial misconduct at trial, arguing that the closing argument of the prosecution was improper. We first note that since no objection was made thereto during the course of final argument, such assertion will ordinarily not be considered on appeal. Nevertheless, we have considered defendant's assertion and examined the record. We note that the trial court excluded the charge of rape from the charges to be read to the jury. Further, we note that it is not misconduct to argue rape as a motive for murder, even though a charge of rape may not be before the jury. *State v. Izatt*, 96 Idaho 667, 534 P.2d 1107 (1975), wherein the Court noted a jury is entitled to have a full picture of the criminal offense even though uncharged crimes may be mentioned. The ultimate question is whether the prosecutor misrepresented the record, and we hold that there was no such misrepresentation.

Finally, we turn to the propriety of the imposition of the death sentence. We begin our inquiry by examining I.C. § 18–4003 which prescribes the degrees of murder. We may immediately eliminate certain subsections of that statute which define first degree murder, i.e., a murder of a peace officer, etc., a murder committed by a person under a sentence for murder, a murder committed by a person incarcerated in a penal institution, and a murder while attempting escape from a penal institution. Likewise, under the record in this case, because of the unusual circumstances, the prosecution was unable to prove, the trial court was unable to find, and this Court is unable to conclude, that the murder fell within the constraints of subsection (d), as committed in the perpetration of arson, rape, robbery, burglary, kidnapping or mayhem. While the record here may be viewed as pointing toward one committed in the course of rape, the record indicates no proof of such beyond a reasonable doubt.

However, there is no doubt that the crime in question here falls within the provisions of I.C. § 18–4003(a), which provides:

(a) All murder which is perpetrated by means of poison, or lying in wait, or torture, when torture is inflicted with the intent to cause suffering, to execute vengence, to extort something from the victim, or to satisfy some sadistic inclination, or which is perpetrated by any kind of wilful, deliberate and premeditated killing is murder of the first degree.

Here the record is clear that the murder in question was "perpetrated" with the intent to cause suffering or to satisfy some sadistic inclination.

I.C. § 19–2515 sets forth the requirements as to findings constituting mitigating or aggravating circumstances, and defines "statutory aggravating circumstances." Said statute in subsection (g) thereof defines statutory aggravating circumstances, and requires that "at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed." We deem that certain of the subsections of (g) may be immediately eliminated as applicable "statutory aggravating circumstances" in the case at bar, i.e.:

1. The defendant was previously convicted of another murder.

2. At the time the murder was committed, the defendant also committed another murder at the same time.

3. The defendant knowingly created a great risk of death to many persons.

4. The murder was committed for remuneration.

. . . .

7. The murder . . . was . . . one defined by I.C. § 18–4003(b), (c), (d), (e), or (f)

. . .

. . . .

9. The murder was committed against a former or present peace officer. . . .

10. The murder was committed against a witness or potential witness. . . .

■ Hence, we hold that statutory aggravating circumstances, at least one of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed, must be found within the strictures of I.C. § 19–2515(g)(5) or (6), i.e., that the murder was especially heinous, atrocious or cruel, manifesting ex-

ceptional depravity, or that the murder exhibited utter disregard for human life. The findings of the trial court in its pronouncement of sentence, as well supported by the record, indicate that the murder was especially heinous, atrocious and cruel, and manifested exceptional depravity. Hence, we hold that at least one of the "statutory aggravating circumstances" was found to exist beyond a reasonable doubt, and that finding of the trial court is supported by the record herein.

■■■ I.C. § 19–2515(d) requires that in all cases in which the death penalty may be imposed, the sentencing court shall, after conviction, obtain a presentence investigation and convene a presentencing hearing. Subsection (e) provides that after said investigations and hearings, the court shall make written findings setting forth any statutory aggravating circumstance and set forth in writing any mitigating factors considered. Thereafter, the statute requires that "if the court finds that mitigating circumstances outweigh the gravity of any aggravating circumstance found so as to make unjust the imposition of the death penalty, the court shall detail in writing its reasons for so finding."

As above noted, the record clearly supports the finding of the trial court that the murder was "especially heinous, atrocious or cruel, manifesting exceptional depravity," within the strictures of I.C. § 19–2515(g)(5). However, we deem it equally clear that while the court made adequate written findings setting forth the statutory aggravating circumstances, the record fails to detail any adequate consideration of the "mitigating factors" considered, and whether or not the "mitigating circumstances" outweigh the gravity of any "aggravating circumstance" so as to make unjust the imposition of the death penalty.

Here the trial court, with adequate factual basis therefore, found that the murder herein was especially heinous, atrocious, cruel and manifested exceptional depravity. The trial court proceeded to consider prior events testified to by another woman, and stated, "who knows, taking the psychologi-

cal makeup of this defendant, that another life may have been snuffed out. The court makes reference to this to help substantiate the conclusion that there is a propensity to commit murder constituting a continuing threat to society." Therein the trial court made reference to an event which did not happen, and utilized that speculation to arrive at a conclusion that the defendant herein had a propensity to commit murder, and would constitute a continuing threat to society. We disapprove such a line of reasoning.

As indicated above, we do not disagree with the conclusion of the trial court that the instant murder was cruel, inhuman, and depraved. However, such a finding does not discharge the statutory duty imposed upon a sentencing court to consider mitigating factors. Although the "mitigating" factors concerning this defendant were set forth by the trial court, the trial court stated: "It is only that they are as feathers on the scale when balanced against the grossly inhumane act of murder that went beyond all human decency."

It is clear that the trial court, while detailing the so called "mitigating" circumstances, clearly failed to adequately consider them and weigh them as against any "aggravating" circumstance. We deem the "mitigating" circumstances as set forth by the trial court to be a demonstration that the instant case presents a defendant who is atypical to any that this Court has viewed in the context of a death penalty case. As stated by the sentencing court, the defendant comes from "a law abiding family, and he is presently married; has a child and was steadily employed prior to his arrest. He is a son, a husband, a father who has conducted himself much of the time within the norms of society." Such a recitation gives us pause. We note that such recitation of the trial court gives the defendant herein considerable benefit of the doubt. The record demonstrates that the defendant shows no remorse or excuse for his acts, but nevertheless at all times has, and continues to maintain complete innocence. The criminal record of the defendant is lengthy, but as noted, he has

never prior to the instant circumstances been convicted of a felony. Nevertheless, the presentence report demonstrates the probability that defendant has committed felonious acts of rape and arson. Hence, we surmise the trial court accepted for the sake of argument, a reasonably decent character of the defendant prior to the instant offense.

We view the record before this Court as demonstrating that the trial court considered "and all of these [mitigating factors] would be *important mitigating circumstances if the consideration was toward rehabilitation and possible probation*." (Emphasis added.)

We do not disagree with the findings of the trial court that the defendant herein is possessed of an "intermittent explosive disorder." Nor do we disagree with the trial court's characterization of the instant crime as being demonstrably cruel, heinous and depraved. Nor do we disagree with the trial court's conclusion that the defendant has shown no remorse, but indeed has continued to deny any participation and to attempt to manipulate other witnesses or evidence.

Nevertheless, we disagree with what we perceive to be the trial court's misperception of the alternatives available to him as a sentencing court. While the defendant's personality and psychological makeup may make the possibility of "rehabilitation and possible probation" non-existent, nevertheless the trial court failed to give adequate consideration of the alternatives which exist between the distant poles of "rehabilitation and possible probation," or the death penalty. Clearly, alternatives were and are available to a sentencing court, such as a fixed life sentence.

We venture no opinion as to the desirability of the imposition of a penalty less than a death sentence in the instant case. It is sufficient to say that such alternatives do exist in the instant case, and are within the discretion of the sentencing court. On the other hand, it is clear in the instant case, given the circumstances of the crime, that it was especially *heinous*, atrocious and cruel, and such circumstances may outweigh *any* mitigating circumstances. Nevertheless, on the present record we hold that the decision of the trial court does not demonstrate an adequate weighing of mitigating circumstances against the aggravating factors. Neither does the record demonstrate that the trial court adequately considered long-term penal confinement as an adequate protection of society, as contrasted with the imposition of the death penalty.

Pursuant to I.C. § 19–2827, we determine that the sentence herein was *not* imposed under the influence of passion, prejudice or other arbitrary factors; that the evidence supports the finding of a statutory aggravating circumstance (I.C. § 19–2515); and that the sentence of death is *not* excessive or disproportionate to the penalty imposed in similar cases.

For all of the above considerations, we affirm the judgment of conviction of first degree murder, but we reverse the trial court's imposition of the death penalty and remand to the trial court for further consideration in light of this opinion. The trial court is, in its discretion, authorized to convene additional hearings and obtain additional information and/or testimony.

Affirmed in part, reversed in part.

BAKES, C.J., and HUNTLEY and JOHNSON, JJ., concur.

JOHNSON, Justice, concurring specially.

I concur with the opinion of Justice Shepard and write only to point out that the trial court appears to have weighed the mitigating circumstances against two aggravating circumstances, collectively instead of separately, contrary to our holding in *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989).

In its "Pronouncement of Sentence" the trial court found that the murder was "especially heinous, atrocious or cruel, manifesting exceptional depravity" and that Leavitt "exhibited utter disregard for human life." These are two of the aggravating circumstances listed in I.C. § 19–2515(g). In pronouncing the sentence

of death on Leavitt, the trial court stated: "The laws of the sovereign State of Idaho give clear direction to the Court that unless the mitigating circumstances outweigh the gravity of the aggravating *circumstances*, the defendant shall be sentenced to death." (Emphasis added.)

In *Charboneau* we held that "the trial court may sentence the defendant to death, only if the trial court finds that all the mitigating circumstances do not outweigh the gravity of each of the aggravating circumstances found and make imposition of death unjust." 116 Idaho at 153, 774 P.2d at 323. On remand, the trial court should weigh all the mitigating circumstances against each of the aggravating circumstances found, separately, rather than weighing all the mitigating circumstances against all aggravating circumstances found, collectively.

BISTLINE, Justice, concurring and dissenting.

Accepting that there are insufficient votes to reverse and remand for a new trial, then I concur only in the result of the majority opinion which sends this case back for proper resentencing. I agree with Justice Johnson's statement that upon resentencing the trial judge must apply principles enunciated in our recent *State v. Charboneau.*

Otherwise I generally cannot agree with the majority opinion's pronouncements on the following issues: (1) the admission of the photographs of the decomposed body of the victim; and (2) the admission of the testimony of the defendant's former wife regarding the defendant's field-dressing of game animals.

A glance at some of the exhibits that the jury had with them during their deliberations and a very quick delving into the transcript of this case makes it all too clear that this was a trial rife with evidence unduly prejudicial to the defendant. Photographs of the victim's decomposed body are the best example of this proposition. At the outset it should be noted that the majority opinion places undeserved reliance upon the brief of the solicitor general in making the following statement:

Since the photographic evidence is relevant, there is no objection on the basis that it could be presented in a somehow less graphic form. The State is not obligated to present evidence which has a lesser impact. *State v. Rollo* [221 Or. 428], 351 P.2d 422 (Ore.1960).

Majority Opinion, p. 290, 775 P.2d p. 604.

The State's brief provided us with this statement:

When photographic evidence is relevant, it is not a ground for objection that it could be presented in less graphic form. The State is not obligated to rely on evidence having the least impact. *See, State v. Rollo* [221 Or. 428], 351 P.2d 442 [422] (Ore.1960).

This state of affairs would not be objectionable if reliance on the Oregon case was justified—but it is not. A reading of the underlying *Rollo* opinion reveals no such proposition which the majority opinion, following the solicitor general's lead, has drawn from it.

However, more important is the substantive law relating to the admission of photographic evidence, and the way in which this photographic evidence was handled. The majority opinion on page 290, 775 P.2d on page 604 claims that the photographs were necessary to show the nature of the crime and the type of wounds inflicted upon the victim's body. However, defendant's counsel was prepared to stipulate that the victim was murdered by knife wounds and to every other fact regarding the state of the victim's body when it was discovered. Tr., Vol. 2, p. 314. Thus, where none of the information conveyed by the photographs was at issue, the photographs were not material, but were irrelevant and cumulative. This same information could have been provided by a coroner's testimony.

If the photographs were not relevant because they did not provide evidence of facts at issue, they should have not been admitted. That the photographs are highly inflammatory renders them even less admissible. These photographs were 8 inch by

12 inch color photos of the victim's body in a shocking state of mutilation and decomposition. State's Exhibit No. 23 was a close up view of the victim's rectal area through which the sexual organs had been removed. Others were close up views of neck wounds which allowed partial views of the victim's face. Interestingly, State's Exhibits 4 and 5 were photos of the victim in life. Exhibit No. 4 was a close up full face portrait of the victim; Exhibit No. 5 was a photo of the victim with family members. All of these photos were in the jury room with the jury during their deliberations. It requires no great leap of imagination to picture what must have gone through the jurors' minds as they compared the photos of the victim in happy days with her family members in life as against the horrifying photos of her body in death. Since defendant's counsel was willing to stipulate to any information which the photos could convey, the district court should have recognized that it would be an abuse of discretion to admit these incendiary photos into evidence. It must be remembered that at the time these photographs were admitted in evidence the defendant was an *accused person* presumed to be innocent. This leads to the question: Was this a fair trial where such inflammatory pictorial evidence was admitted in a trial where there was no question but that murder had been committed, and the issue to be resolved was whether the accused was the perpetrator? This is especially so here, where as the majority itself has noted, the State's case rests on circumstantial evidence.

In passing on the admissibility of the photographs, Justice Shepard properly acknowledges *State v. Martinez*, 92 Idaho 183, 439 P.2d 691, relied upon by the defendant: "Therein the Court dealt with the need to balance the probative value and relevance of such evidence against resulting prejudice to the defendant. We agree with the *Martinez* balancing rule." The next sentence, however, after conceding that "the photographs were admittedly gruesome in nature," asserts—without explain-

ing why or how—that the photographs "were necessary to show the nature of all the circumstances, and although such information may be gruesome in nature it is necessary to make an intelligent fact finding decision." Maj. Op., at p. 290, 775 P.2d at p. 604.

The statement that the photographs were necessary is sheer *ipse dixit* which does not include therein any balancing of prejudice versus probative value, which was said to be the rule of *Martinez*. Moreover, if *Martinez* included any issue of *gruesome* photographs having been admitted at trial I am uninformed by reading it. "Martinez was charged with the second degree murder of one Michael Anthony Calborn, a two-year ten-month old infant" who died as a result "of injuries alleged inflicted by (defendant's) repeated kicking and striking the deceased's body." 92 Idaho 184, 439 P.2d 691.[1] On appeal of *Martinez's* conviction, Justice Spear in authoring the Court's unanimous opinion, noted as to a contention that the photographs were inadmissible, that "they were admitted for the stated purposes of identification, as an aid to the jury in understanding the nature and extent of the injuries, and as probative of implied malice, *i.e.*, that appellant had acted with an abandoned and malignant heart ... The record shows that the trial court carefully considered objections ... for the state's purposes hereinbefore mentioned." 92 Idaho at 192–193, 439 P.2d 695–696.

Justice Shepard, for a majority, says only as to the admission of the photographs, "that although such information may be gruesome in nature it is necessary to make an intelligent fact-finding decision" (Maj. Op., p. 290, 775 P.2d at p. 604.) citing *State v. Izatt*, 96 Idaho 667, 534 P.2d 1107, for the quoted proposition. *Izatt* in an interesting case, but on four or five readings of it, I marvel at it being cited by the majority for the proposition it is said to support, which is the more remarkable because Justice Bakes who today joins Justice Shepard's opinion, authored *Izatt*. Neither

---

**1.** It is of interest to note that a similar infant homicide, *State v. Stuart*, 110 Idaho 163, 715

P.2d 833 (1986), resulted in a charge of torture murder, a conviction, and a death sentence.

*Izatt* nor *Rollo* substantiate the propositions for which they are offered.

Along the same lines of unnecessary prejudice was the admission of the testimony of the defendant's former wife regarding the defendant's activities while field-dressing game animals. While it may have contained some kernel of relevance concerning the specific type of mutilation of the victim's body in this case, for certain the testimony was highly prejudicial. It allowed the prosecution to portray the defendant as a grotesque deviant, which in the mind of the average juror would lead to the conclusion that defendant was a bad person, and therefore he likely was the person who committed the murder. The majority's statement that the prejudicial effect of this evidence was inconsequential because almost all evidence in a criminal trial is prejudicial to a defendant misses the point. Evidence to obtain a conviction is and is intended to be prejudicial. That is a given. But it should be evidence relating to the crime committed.

As one delves into the record it becomes apparent that the district court was overly kind in allowing the prosecutor to have admitted virtually any evidence which it presented. The defendant's wife was allowed to testify as to the defendant's obsession with knives. Actual knives were allowed to be introduced into evidence, not withstanding that there was no contention that such were murder weapons. These were knives which the defendant happened to own. These knives had absolutely no relevance to the case. Other evidence, on a par with photographs of the victim admitted into evidence included photographs of an anatomically correct life-sized female doll which was graphically altered to demonstrate the victim's wounds. The jury entered upon its deliberation in a jury room reeking of the unfair prejudice from evidence which the prosecution did not need to show that the victim had been murdered, and the defendant may have been the perpetrator.