*617 REINHARDT, Circuit Judge,
dissenting:
The circumstances of Richard Leavitt’s murder of Danette Elg are indeed horrendous. That alone should have been a signal that there was something radically wrong with Leavitt, who was otherwise a law-abiding citizen, a father and a husband. I agree with the trial judge who sentenced Leavitt to death that “the fact that” such a person “would do this act leaves one[ ] asking why.” Leavitt’s counsel, David Parmenter, failed to provide an answer to that question that could have saved his client’s life: Leavitt suffered from an organic brain disorder in the part of the brain responsible for regulating emotion and impulse control. Despite the majority’s many tangents and alternative holdings, Leavitt’s habeas petition concerns one simple point: whether counsel should have made a motion for the MRI examination of his brain that the court-appointed neurologist had recommended. Had Parmenter done so, the examination would have revealed Leavitt’s organic neurological disorder — powerful mitigating evidence that could well have altered the sentencing decision of the trial court. That alone is sufficient to resolve this case. Parmenter’s failure, despite the neurologist’s recommendation, to seek the examination that was necessary to establish the existence of Leavitt’s organic brain disorder unquestionably rendered his performance deficient; and that inexplicable conduct prejudiced his client under any reasonable standard. Not surprisingly, the United States District Court for the District of Idaho so found, and we are asked simply to affirm the lower court.
Parmenter, who represented Leavitt at his resentencing, knew the following at the time of that hearing: (1) Prior to Leavitt’s original sentencing, his court-appointed neurologist had recommended further examination, specifically an MRI, to determine if Leavitt had “organic or physiological disfunction [sic] of the brain” after a CT scan revealed abnormalities in his brain’s white matter. (2) Leavitt’s original trial counsel had then attempted to obtain an MRI before Leavitt was sentenced, but the trial court had denied counsel’s motion for a continuance to do so. (3) The trial court had erroneously considered Leavitt’s diagnosis — for personality disorders, rather than an organic brain disorder — to be an aggravating, rather than a mitigating, factor, in pronouncing Leavitt’s first death sentence. (4) The Idaho Supreme Court had subsequently vacated Leavitt’s death sentence on appeal, because the trial court record failed to show (a) “an adequate weighing of mitigating circumstances against the aggravating factors” and (b) a “demonstration] that the trial court adequately considered long-term penal confinement as an adequate protection of society, as contrasted with the imposition of the death penalty.” State v. Leavitt, 116 Idaho 285, 775 P.2d 599, 601 (1989). (5) When the case was on remand, both Leavitt and his mother had requested a new “presentence investigation” and asked Parmenter to further develop the neurological evidence. (6) During the resentencing hearing, the trial court expressed its “desire to give the defendant all of his rights.” (7) One of those rights included “access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense,” as to which Leavitt’s mental condition had been shown to be a significant factor. Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (emphasis added). And (8) in general, as capital defense counsel he was obligated to investigate and present evidence of mental impairment, in light of the mitigating force of such evidence. See, e.g., Evans v. Lewis, 855 F.2d 631, 636-637 (9th Cir.1988).
*618 Any reasonable attorney under these circumstances would have renewed the motion for the MRI scan that Leavitt was wrongly denied prior to his original sentencing — a scan that we now know would have revealed white matter hyperintensities in the right frontal lobe of his brain, which are organic neurological irregularities in an area believed to be responsible for regulating emotion and impulse control. Because evidence of such an organic disorder is the kind of mitigating evidence by which a defendant’s “moral culpability would have been reduced,” a reasonable attorney might well have saved his client from the death penalty by obtaining that evidence and presenting it to the court. Caro v. Woodford, 280 F.3d 1247, 1257-1258 (9th Cir.2002). Nevertheless, Parmenter totally neglected to do so upon resentencing, even though the Idaho Supreme Court had already expressed concern over Leavitt’s mitigation profile — a failure that Parmenter himself has since admitted “[i]n retrospect” was “probably” unjustified.
In light of the clear evidence of Parmenter’s deficient performance regarding the most important aspect of the penalty phase of Leavitt’s trial, and Leavitt’s inexplicable behavior surrounding the commission of the murder, there is, at the least, a “reasonable probability” that, had Parmenter sought and obtained the test that would have shown Leavitt’s organic brain disease, a reasonable trial court would have sentenced Leavitt to life without parole, or alternatively that the new death sentence, like the first, would have been reversed on appeal or vacated on habeas corpus. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Leavitt was therefore prejudiced by Parmenter’s ineffective assistance. Accordingly, I would affirm the judgment of the Chief Judge of the United States District Court for the District of Idaho, including his conditional grant of the writ.
I. Deficient Performance
Parmenter chose not to move for an MRI examination during the resentencing proceedings — notwithstanding his client’s own request that he do so — for the simple reason that he thought the trial court would deny the motion again. As he acknowledged at the evidentiary hearing in these habeas proceedings, however, “there was really no reason not to at least ask the judge to grant” a renewed motion, especially in light of the failure of counsel at the first hearing to advise the judge of the controlling Supreme Court decision, Ake. Parmenter’s fear that the motion might be denied again did not justify his failure to attempt to obtain the critical evidence that would allow him to make the strongest argument possible in his client’s favor.
The majority’s view — that it was “perfectly reasonable” for Parmenter to refrain from renewing the MRI request because moving for further neurological investigation could have “irritate[d] the judge and hurt his client’s case,” maj. op. at 611 cannot be taken seriously, for it “rests on the apparent belief that our Nation’s trial judges ... are unwilling to accept zealous advocacy and that, once antagonized by it, will punish such advocates with adverse rulings.” Melendez-Diaz v. Massachusetts, - U.S. -, 129 S.Ct. 2527, 2555, 174 L.Ed.2d 314 (2009) (Breyer, J., dissenting) (internal quotation marks and alteration omitted). To the contrary, “in death cases” judges generally expect that, given the stakes, “[i]t’s the battle of the zealots.” Alex Kozinski, Tinkering with Death — A death-penalty judge reflects: How does it feel to send another man to die?, The New Yorker (Feb. 10, 1997), at 50. Even worse is the idea that the judge whose actions we review would order the *619 execution of a capital defendant because he became irritated by the lawyer’s renewal of a motion. “[Signing the order that will lead to the death of another human being” is the gravest duty a judge has, capable of “filling [him] with a nagging sense of unease, something like motion sickness.” Kozinski, Tinkering with Death, at 48, 52. In this circumstance, no reasonable person could believe that annoyance at a lawyer’s motion would lead a judge to reach that result.
Indeed, any fear Parmenter may have had of an adverse ruling was unreasonable in light of the weight of authority that would have supported his motion, including a critical Supreme Court decision that original counsel had not brought to the trial court’s attention during Leavitt’s first sentencing proceedings. Under Ake, when a mental health professional has made a plausible showing that testing, such as an MRI, constitutes part of an “appropriate examination,” that testing is one of the “raw materials integral to the building of an effective defense” that the State must provide to the defendant. Id. at 77, 105 S.Ct. 1087. No reasonable counsel, knowing that controlling authority on a critical issue had not been presented the first time, would have declined to even attempt to renew the motion.
The majority nonetheless offers a number of other theories as to why Parmenter’s failure to request an MRI examination was a reasonable strategic decision. First, the majority suggests that Parmenter deliberately decided not to revisit the organic neurological issue in light of the inconclusive neurological findings prior to Leavitt’s original sentence. Maj. op. at 608-09. That bit of appellate factfinding must come as news to Parmenter, who testified, as set forth above, that he had not renewed the motion for further neurological examination because the trial court had previously denied that motion during the first sentencing proceedings — -not that he believed the neurological case to be weak. In any event, there is no way Parmenter could have actually decided whether a mitigation strategy based on Leavitt’s organic brain disorder was the superior one without first investigating whether Leavitt in fact had such a disorder.[1]
Second, the majority suggests that Leavitt’s counsel made a reasonable choice not to move for an MRI because the trial court had previously considered “the mental health issue” to be an aggravating factor rather than a mitigating factor. Maj. op. at 611. But the majority’s sleight of hand should not mislead anyone; characterizing an MRI examination as merely additional “mental health evidence” blurs an important distinction. The manner in which the trial court had previously considered Leavitt’s then-diagnosed personality disorder would have told Parmenter nothing about how the court would have viewed the neurological disorder that the MRI would have revealed. Evidence of “organic brain dysfunction could have provided significant mitigating evidence,” Summerlin v. Schriro, 427 F.3d 623, 643 *620 (9th Cir.2005) (en banc). Defense counsel accordingly had a “duty to investigate and present mitigating evidence of mental impairment.” Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir.1998).
Even in cases involving many aggravating factors, including the gruesomeness of the crime, counsel’s failure to present evidence of an organic neurological condition at the sentencing phase is sufficiently prejudicial to establish ineffective assistance of counsel. See Douglas v. Woodford, 316 F.3d 1079 (9th Cir.2003). Indeed, the Supreme Court has made clear that “evidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse.” Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (citing California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Con-nor, J., concurring)). Thus, it was entirely unreasonable to fear broaching “the mental health issue” again, even if Parmenter did think of organic neurological disorders and personality disorders as indistinct, particularly given that the trial judge was no doubt aware of the fact that the Idaho Supreme Court had already reversed his decision for failing to give sufficient consideration to mitigating factors.[2]
The majority is left with the argument that Parmenter “made a strategic decision to focus on convincing the judge that Leavitt was a ‘good guy,’” and accordingly “made a thorough investigation in preparation for the sentencing hearing” by reviewing the transcripts and records from prior proceedings, speaking with Leavitt’s immediate family members, and inquiring into Leavitt’s behavior while incarcerated. Maj. op. at 607, 608-09. Parmenter could not have “made a strategic decision” as to which mitigation argument to make, however, without knowing whether Leavitt had organic brain damage. That he conducted a thorough investigation relevant to one possible strategy does not make any more reasonable his failure to investigate a potentially much stronger case for mitigation. Parmenter simply neglected the one subject that he should have known mattered most.
The majority is correct in one respect: “Good guys” simply don’t go around “hacking] out [a dying victim’s] womanhood” or “playing with the female organs of a deer.” Maj. op. at 607. It is far more likely that a person who engages in such conduct has an organic mental disorder than it is that he is simply a likeable fellow who had a bad day — or two. Faced with Dr. Jaynes’s testimony from the first sentencing proceedings that cortical atrophy suggested a possibility of organic neurological disease, and the reality that further testing would be required to determine if Leavitt had “organic or physiological dis-function [sic] of the brain,” Parmenter sim *621 ply lacked any excuse for not moving for the MRI examination to which Leavitt was constitutionally entitled.[3] See Summerlin, 427 F.3d at 630 (“We have long recognized an attorney’s duty to investigate and present mitigating evidence of mental impairment.”) (internal quotation marks omitted). No reasonable, competent counsel would have conducted Leavitt’s resentencing proceedings as Parmenter did. His performance was without question deficient.
II. Prejudice
If Parmenter had submitted a motion for an MRI in 1989, there is at least a “reasonable probability” that an objective decision maker would have granted the motion. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. If, for some reason, the court had denied such a motion, there is a reasonable probability that this error would have been reversed on appeal — either by the state appellate court or during federal habeas proceedings — and the MRI would ultimately have been ordered. I can be confident that this is so because under governing Supreme Court authority that existed by that time, when an indigent “defendant demonstrates to the trial judge that his [mental condition] at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.” Ake, 470 U.S. at 83, 105 S.Ct. 1087 (emphasis added).
Here, it seems, there was even more than a “reasonable probability” that the motion would not have been denied again: Parmenter testified that, in his experience, the particular trial judge who presided over Leavitt’s case was more prone to change his decisions than other judges were, if shown a good reason for doing so, and the Ake argument that had been overlooked the first time would certainly have been a good reason. Moreover, any objective sentencing judge who followed the applicable law would have allowed neurological testing to take place if competent counsel had timely filed a motion under Ake requesting an MRI. Then, had testing been ordered, an MRI undertaken in 1989 would have revealed Leavitt’s brain injury, as the district court found and neither the State nor the majority dispute. There is a reasonable probability that the court would then have seriously considered the mitigating evidence of Leavitt’s brain injury and sentenced him to life imprisonment rather than death.
The majority disagrees, contending that Leavitt was not prejudiced by Parmenter’s
*622 ineffectiveness because, it assures us, there is no way the motion would have been granted had it been made. Apparently, the majority believes that the trial judge would have disregarded professional norms, Supreme Court precedent, and this court’s precedent, and ruled erroneously on a motion to obtain further neurological testing. Even if, in actuality, the trial court had not been willing to apply controlling law, that would not be relevant to our inquiry; instead, for purposes of a prejudice analysis, Leavitt is entitled to the presumption of a reasonable, lawful, and “objective” adjudicator who will follow the law. See Summerlin, 427 F.3d at 643. “[A] defendant has no entitlement to the luck of a lawless decisionmaker,” and neither does the State, so we cannot presume that the motion would have been denied not-withstanding controlling law to the contrary. Strickland, 466 U.S. at 695, 104 S.Ct. 2052. Furthermore, even if the motion had been denied, or if the trial court failed to give significant weight to the result of the MRI examination, competent counsel would have appealed — and there is a reasonable probability that the state supreme court would then have reversed the sentencing judge (again) or vacated the sentence during state habeas proceedings. See, e.g., State v. Leavitt, 116 Idaho 285, 775 P.2d 599, 608 (1989) (reversing Leavitt’s first death sentence for errors during sentencing proceedings). In short, there was no excuse for Parmenter’s failure to renew the motion for further neurological examination. That failure rendered his performance deficient, and that deficiency prejudiced Leavitt.
Alternatively, the majority finds “no reason to believe the judge didn’t take Leavitt’s [own oral] request[for another psychological evaluation] into consideration,” and therefore concludes that a properly filed motion would similarly have been considered and denied. Maj. op. at 614. But we have absolutely no evidence, and the district court made no factual finding, that the sentencing judge did consider the informal oral request made by the defendant, as he would have been required to consider a written motion prepared by counsel. Indeed, while the trial court ruled on counsel’s motion during the first sentencing hearing in a written order, the court did not rule on Leavitt’s oral request at all. Furthermore, had Parmenter submitted a motion for an MRI, it surely would have included citations to the applicable authorities, such as Ake, and therefore would have been far more persuasive than Leavitt’s informal request, which did not mention either an MRI or the legal authority supporting his request. “That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the wide-spread belief that lawyers in criminal courts are necessities, not luxuries.” Gideon v. Wainwright, 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Leavitt’s own oral request did not and could not render harmless his counsel’s failure to move for an MRI examination, as the majority appears to believe.
The majority also holds that Leavitt was not prejudiced by Parmenter’s conduct because Leavitt’s white matter hyperintensities, which would have been discovered had an MRI been ordered, “just don’t tell us very much.” Maj. op. at 614. It reaches that conclusion because the medical experts who testified at Leavitt’s evidentiary hearing spoke in hedged terms about the causes and effects of these anomalies in the brain. My colleagues fail to appreciate that doctors, unlike litigators, do not speak with absolute certainty and confidence— particularly where, as here, they are describing the scientific findings in a field where research is ongoing and the scientific community’s understanding of the *623 brain’s inner workings is constantly developing.[4] Moreover, the prejudice inquiry is not concerned with certainties; rather, we must consider simply whether “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different,” meaning “a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. It is therefore sufficient that the MRI evidence would have revealed abnormalities that are significantly correlated with “neuropsychiatric disorders,” because this evidence of organic brain damage is “sufficient to undermine confidence” that Leavitt would still have been sentenced to death had that evidence been presented.
Applying Strickland, we have set aside sentences on the basis of ineffective assistance of counsel without needing to speculate about what sentence would be imposed at the new sentencing hearing to follow. Rather, it has sufficed that our confidence in the sentence on review has been “undermined” because of counsel’s deficient performance, even when the circumstances of the crime of conviction were particularly brutal. See, e.g., Lambright v. Schriro, 490 F.3d 1103, 1121, 1126 (9th Cir.2007); Summerlin, 427 F.3d at 643; Stankewitz v. Woodford, 365 F.3d 706, 723 (9th Cir.2004); Douglas, 316 F.3d at 1091; Ainsworth v. Woodford, 268 F.3d 868, 878 (9th Cir.2001). The majority should have adopted the same approach in this case.
Even if I were to attempt to predict the outcome of a hypothetical new sentencing hearing, as the majority does, I could not reach the same result with any confidence. Evidence of organic brain injury, of a kind that may physically compel behavior or prevent emotional regulation of certain conduct, is the kind of evidence that suggests a defendant’s “moral culpability would have been reduced.” Caro, 280 F.3d at 1257-1258. Under our case law, such evidence, if it is credible, is considered weightier than evidence of non-organic, purely psychiatric or personality disorders, such as intermittent explosive disorder, that involve “a lack of emotional control.” Id. at 1258. Leavitt’s organic brain injury is of a kind that typically prevents individuals from exercising control over their behavior. His injury is present in the area of the brain thought to be responsible for regulating emotions, impulse control, and conduct, and falls firmly within the category of disorders that a sentencing court should ordinarily weigh more significantly in mitigation than run-of-the-mill psychiatric problems or non-organic personality disorders.
When considering punishment, courts generally treat an individual’s failure to control a personality disorder, or to suppress an anti-social or psychopathic personality, as more blameworthy than an individual’s response to an organic brain *624 disorder. Whether or not this difference in assessing blame is warranted in this case is not a matter for us to decide; the court’s duty is to apply the law as it now exists.[5] This court’s case law is replete with examples of the considerable weight that should be accorded at sentencing to evidence of neurological or organic damage.
In Caro, for example, we held that there had been prejudice at sentencing resulting from counsel’s failure to call an expert during the penalty phase of the trial to testify about a capital defendant’s organic brain injury, even though the jury heard testimony regarding other psychological or emotional problems. We emphasized that particular weight should always be given by a trier of fact during sentencing to evidence of organic injury because of the effect of such evidence on a finding of moral culpability. Id. at 1257-1258. In Douglas v. Woodford, 316 F.3d 1079 (9th Cir.2003), we similarly determined that the petitioner received ineffective assistance of counsel because counsel failed to investigate and present mitigation evidence that the petitioner suffered from “possible organic impairment” and test results revealed “some level of preexisting neurological deficit.” Id. at 1086. We held that the petitioner suffered prejudice at the sentencing phase because such evidence “was precisely the type of evidence that we have found critical for a fact-finder to consider when deciding whether to impose a death sentence.” Id. at 1090. I therefore believe that we cannot have confidence that if the sentencing judge had been presented with mitigating evidence pertaining to Leavitt’s brain injury he would have imposed the death penalty nonetheless.
That there may not be a direct causal connection between Leavitt’s brain abnormalities and his criminal act does not affect this analysis. Although it is difficult to conceive of the “horrific” offense committed by Leavitt being committed by anyone with a normal mind — or, in legal-medical terms, anyone without an organic brain disorder — the Supreme Court has held that no such connection is necessary for the existence of mental disorders to serve as a mitigating factor during sentencing. See, e.g., Penry v. Johnson, 532 U.S. 782, 797, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (holding that the sentencing factfinder should “consider and give effect to” all potentially mitigating circumstances at sentencing.).
Moreover, the very existence of neurological problems may serve as mitigation at sentencing by eliciting sympathy from the sentencer. See Douglas, 316 F.3d at 1090; see also Hendricks v. Calderon, 70 F.3d 1032, 1043 (9th Cir.1995) (holding that mental health evidence could be mitigating at the penalty phase “even though it is insufficient to establish a legal defense to conviction in the guilt phase”). The district court correctly held that evidence *625 of an organic brain defect may humanize a defendant, “in a way that the labels of antisocial personality disorder and intermittent explosive disorder d[o] not.” As the district court noted in its findings of fact and conclusions of law, the role that Leavitt’s brain injury may have played in his commission of the murder is “still not entirely free from ambiguity and uncertainty,” but despite this uncertainty, there is no doubt that “the complete picture” including Leavitt’s organic brain disorder “presents a stronger and more sympathetic mitigation profile than the one that was before the sentencing factfinder.”
Evidence of serious mental problems— even such problems that are not organic in nature — may be sufficiently mitigating to warrant the imposition of a life sentence, rather than the death penalty, even in cases in which individuals have been convicted of truly horrific crimes. For that reason, our court and the Supreme Court have held that assistance of counsel was ineffective when potentially mitigating evidence of a defendant’s mental condition was not presented. See, e.g., Rompilla v. Beard, 545 U.S. 374, 391, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Williams v. Taylor, 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Lambright, 490 F.3d at 1125; Stankewitz, 365 F.3d at 723. Thus, we cannot assume that the grievous nature of the offense renders the failure to present evidence of the organic nature of a brain disorder nonprejudicial. The potential mitigating effect of Leavitt’s neurological impairment was all the more likely given that the “factfinder” at the penalty phase of Leavitt’s trial was a judge, who we must presume to have been well-versed in the case law and modern notions of criminal culpability, rather than a “jury[,j [which] might have concluded that [Leavitt] was simply beyond rehabilitation.” Pinholster, 131 S.Ct. at 1410; contra maj. op. at 615. Parmenter’s failure to present evidence of such problems prejudiced Leavitt’s defense. To put it differently, the failure should be sufficient to undermine our confidence in the verdict.
The majority’s effort to downplay the evidence of organic brain damage as “cumulative” mitigation evidence is simply incorrect. “We certainly have never held that counsel’s effort to present some mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.” Sears v. Upton, — U.S. —, —, 130 S.Ct. 3259, 3266, 177 L.Ed.2d 1025 (2010). In this case, some mitigation evidence was presented on an unrelated topic, but none of that evidence approached what an MRI scan would have revealed in its ability to portray Leavitt as mentally disabled, rather than mentally disturbed. The MRI evidence would be far more than an “additional feather” on the scale of mitigating and aggravating evidence. Contra Maj. op. at 616. Nor is Wong v. Belmontes, — U.S. —, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) (per curiam), “instructive” on this point. In Belmontes, counsel failed to present evidence pertaining to the defendant’s upbringing and character that was, according to the Court, substantially similar in type to evidence that counsel did present regarding the defendant’s family life. Evidence of Leavitt’s organic brain disorder, by contrast, is entirely unlike the evidence of emotional or other mental problems introduced in this case — evidence that may in fact reflect a mistaken diagnosis — given the greater power of the former class of evidence to reduce moral culpability. See Caro, 280 F.8d at 1257-1258.
Finally, it should be obvious to anyone that the more horrendous the crime, the more likely it is that the perpetrator is suffering from some form of mental disorder. When that disorder is organic, it *626 becomes more understandable to society why a human being would commit such an horrendous act.[6] Under our legal system, a brain disorder, no matter how serious, does not provide a defense unless it results in an inability to distinguish right from wrong. (Here, there is no question of legal insanity.) The law does, however, require that the sentencer be presented with all available information regarding an organic brain ailment and that such information be fully weighed in the balance before a decision is made to terminate the life of the person suffering from that disease. The most compelling mitigation evidence in the case of horrendous crimes is, in fact, evidence of organic brain disorder. In every such case, that evidence must be given serious consideration. Under the present state of the law, given the relationship between the egregiousness of the offense and the gravity of the mental disorder, it is difficult to envision how we could ever be confident in advance that an objective sentencer would impose a death penalty notwithstanding that the defendant is suffering from an organic brain ailment.
In short, there can be little doubt that Parmenter’s incompetent performance is “sufficient to undermine confidence in the outcome,” and thus prejudiced Leavitt. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. It would not have been “insan[e]” for Parmenter to move the trial court for the MRI examination to which Leavitt was constitutionally entitled, and to cite the controlling Supreme Court authority of which the trial judge had not been advised the first time. Contra Maj. op. at 616. To the contrary, making such a motion was an essential part of Parmenter’s duty to provide effecfive assistance. His failure to seek, obtain, and introduce the evidence establishing that Leavitt suffered from organic brain damage necessarily undermines any reasonable jurist’s confidence in the outcome of the sentencing proceeding. I regret that my colleagues, rather than reach the same conclusion, have decided to disregard the controlling law and the compelling facts of this case. Accordingly, I dissent.

. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), does not bear on our analysis. That case, unlike this one, was governed by AEDPA and its "doubly deferential" standard of reviewing counsel's performance. Id. at 1403, 1410. Moreover, Pinholster did not modify the standard for deficient performance set forth in Strickland; it simply applied that standard under the "highly deferential” mode of analysis dictated by AEDPA. Id. at 1403-1408. Pinholster reaffirmed that, under Strickland, " 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.’ ” Id. at 1407 (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052) (alterations and emphasis omitted). Under this standard, Parmenter's decision was unreasonable.

. The majority’s suggestion that in vacating Leavitt’s first death sentence, the Idaho Supreme Court approved of the trial court’s decision to consider evidence of Leavitt’s personality disorders to be aggravating is totally unsupported by the state court’s opinion. Maj. op. at 613. The court first noted that it did not disagree with the trial court’s factual finding that Leavitt had an “intermittent explosive disorder.” Leavitt, 775 P.2d at 608. Then, the court observed that while “the defendant’s personality and psychological makeup may make the possibility of 'rehabilitation and possible probation’ non-existent,” the absence of such a possibility did not excuse the court’s failure to consider whether the mitigating evidence presented should have yielded a sentence of life imprisonment rather than death. Id. Unsurprisingly, when considering the same psychological evidence on remand, the trial court recategorized it as mitigating evidence.

. The majority cites West v. Ryan, 608 F.3d 477 (9th Cir.2010), to argue that Jaynes’s report contained mere "red flags” that Parmenter could reasonably have decided to ignore in favor of other mitigation strategies. Maj. op. at 609-10. The majority’s reliance on West — another case governed by the “deferential” AEDPA standard, unlike this one, id. at 486 — is misplaced. In West, an examining physician's report stated that it could not "rule[] out” a cognitive impairment caused by head injuries or substance abuse absent further testing, but there is no record that the physician affirmatively recommend such testing, in light of his many other tests of the defendant. Id. at 489. Dr. Jaynes did recommend further testing of Leavitt “to determine whether he has an organic or physiological disfunction [sic] of the brain” — a recommendation that counsel at Leavitt's first sentencing acted upon by requesting an MRI examination. Whether counsel may reasonably fail to follow up on every lead even hinted at in the record concerning possibly mitigating evidence like the vaguely defined "cognitive impairment” due to trauma or substance abuse, as in West, and whether counsel may reasonably reject the specific recommendation of a medical expert concerning categorically mitigating evidence such as an organic brain disorder, are two entirely different questions.

. Nor is the evidence of a brain disorder "speculative”; the MRIs Leavitt introduced into the record provide strong evidence of them. Maj. op. at 614 (citing Bible v. Ryan, 571 F.3d 860, 871 (9th Cir.2009)). But see Bible, 571 F.3d at 871 ("Bible does not contend that he actually suffers from organic brain damage and he submitted no evidence of that.... Bible’s argument, as we see it, relies on speculation that he may have some type of organic brain dysfunction or disorder.... Bible does not demonstrate that the results of further testing would have found a brain disorder. In his petition to the PCR court, Bible submitted a brief affidavit from a psychologist who opined that a neurological examination could document the effects of brain damage, but did not express the opinion that Bible suffered from any effects from early illnesses. Bible has not shown that more tests would have discovered and disclosed mitigation evidence sufficient to establish prejudice.”).

. The criminal law's treatment of mental health issues evolves over time, for better or worse. The definition of insanity, for example, has changed from time to time. See, for example, the Durham test, as set forth in Durham v. United States, 214 F.2d 862 (D.C.Cir.1954) ("an accused is not criminally responsible if his unlawful act was the product of mental disease or defect”), as contrasted with the stricter and currently accepted test of an individual's ability to distinguish right from wrong. See Clark v. Arizona, 548 U.S. 735, 742, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006). Still, one difference that may serve to make the distinction at issue here somewhat justified is that, as the district court found, victims of a physical brain disease are able to control their conduct in a structured environment, whereas individuals who suffer from intermittent explosive disorder are not, decreasing the likelihood that an individual with an organic injury will pose a risk to others while incarcerated.

. At Leavitt's second sentencing hearing, the trial judge suggested that he was struggling to understand why Leavitt had committed the murder, stating that "[t]he fact that a[] generally law-abiding citizen, a father, husband, and so would do this act leaves one’s [sic] asking why.” Evidence of Leavitt’s organic brain disorder would have made the commission of such a horrendous crime far more comprehensible to the judge.