883 P.2d 1069

STATE of Idaho, Plaintiff–Respondent,

v.

Rauland J. GRUBE, Defendant–
Appellant.

No. 19691.

Supreme Court of Idaho,
Idaho Falls May Term, 1994.

Sept. 7, 1994.

Rehearing Denied Nov. 22, 1994.

Rigby, Thatcher, Andrus, Rigby & Kam, Rexburg, for appellant. Michael S. Kam and Gregory W. Moeller argued.

Larry EchoHawk, Idaho Atty. Gen. and Michael J. Kane, Deputy Atty. Gen., argued, Boise, for respondent.

TROUT, Justice.

This is a murder case in which the defendant, Rauland J. Grube (Grube), was found guilty of first-degree murder and sentenced to a term of life in prison without the possibility of parole. Grube was convicted in 1991, for the 1983 shotgun murder of Amy Hossner (Amy) in Ashton, Idaho. On appeal, Grube challenges the conviction, sentence and the district court's denial of his Rule 35 motion for reduction of sentence. We will address each issue in turn.

## BACKGROUND

Amy Hossner was murdered while she slept in her bedroom in the early morning hours of June 4, 1983, by a single shotgun blast through a small basement window above her bed. The murder was reported to the local police later that morning by her father, Fred Hossner.

During the course of the investigation there were two suspects, Steven Brood (Brood) and Grube. Brood was a suspect because he owned a sawed-off shotgun which the local officers believed could have caused the fatal injuries. Grube became a suspect when he reported his shotgun stolen in July of 1983, and indicated that he feared his missing shotgun might have been used to kill Amy Hossner. At the same time he turned over to the police a Kool–Aid can of Remington–Peters shotgun shells, three of which he claimed were missing. On July 18, 1983, Grube's brother notified the police that Grube's shotgun had been found and was not stolen; he then turned it over to the police. Brood also turned his sawed-off shotgun over to the authorities. Brood's gun, along with a police shotgun and the shotgun obtained from Grube, were sent to California to be tested by an expert, Ed Peterson (Peterson), with the Bureau of Alcohol, Tobacco and Firearms (ATF). After testing the weapons by firing them through a re-creation of the crime scene, Peterson eliminated Grube's shotgun as a possible murder weapon.

In 1991, eight years after the murder, Grube again became a suspect based on information given by Brenda Fredrickson Briggs, who delayed coming forward allegedly because of her immaturity. She told the police that in 1983, Grube had approached her and told her that he had a crush on Amy and had spoken to her through her bedroom window the night of the murder. Briggs also recounted that Grube told her when Amy failed to meet him several hours later, he went back to her house and looked in the window, whereupon he told Briggs that he had "never seen so much blood in his life." Thereafter, Grube became the prime suspect and additional firearm tests were performed on his shotgun.

The first of the second battery of tests performed with Grube's shotgun was performed by F.B.I. agent Gerald Wilkes (Wilkes) who concluded after test firing the weapon that no 12 gauge shotgun could be eliminated as the murder weapon. Additional tests were performed by Martin Ols (Ols) of the Idaho Department of Law Enforcement (DLE), including a test firing into a deer neck after the trial had started. After his test firings of the weapon, both into cardboard and into the deer necks, Ols was convinced that Grube's weapon could not be excluded as the murder weapon. After seeing the results of Ols' test firings of the weapon into the deer necks, Peterson changed his opinion and agreed that Grube's weapon could not be eliminated as a possible murder weapon.

In 1991, Grube was charged with the murder of Amy Hossner. During the trial witnesses testified not only about the various

tests run on the guns, but also about conversations they had with Grube after the murder in which Grube expressed a great interest in Amy's murder and even told one witness he was a police officer and wanted to avenge Amy's death. The defense had Jim Mason, another firearms expert, testify that after he reviewed all the test firings of Grube's weapon he felt it was unlikely that Grube's shotgun was used to kill Amy.

At the close of evidence, the court instructed only on first and second-degree murder and refused the parties' request to instruct on the lesser included offenses of voluntary or involuntary manslaughter, finding that those instructions were not supported by the evidence. Grube was then convicted of first-degree murder in connection with the death of Amy Hossner and was sentenced to life imprisonment without the possibility of parole. Grube moved for a reduction of sentence which was denied by the court. On appeal, Grube presents us with the following issues arising from the trial:

I. The district court erred in refusing to instruct the jury on the lesser included offenses of voluntary and involuntary manslaughter.

II. The district court erred in refusing to suppress the firearm test results conducted after trial had commenced.

III. There was error committed in certain evidentiary rulings by the district court.

IV. The district court erred in not giving a limiting instruction for the jury's consideration of certain evidence.

V. The district court should have excused one of the potential jurors based on statements in her juror questionnaire.

VI. The district court erred in refusing to allow into evidence Brood's polygraph examination.

VII. The district court should have permitted a witness to testify about information gained in the Brood investigation.

VIII. The district court erred in not granting Grube's motion for acquittal.

IX. The district court erred in not allowing Grube's expert witness to testify to certain hearsay statements from a shotgun shell manufacturer.

X. The cumulative effect of the errors committed by the district court mandate a new trial.

In addition, Grube asserts that there were errors in the district court's imposition of sentence and error committed in not granting Grube's Rule 35 motion for reduction of sentence.

## I.

Grube first argues that the district court erred in not instructing the jury on the lesser included offenses of voluntary and involuntary manslaughter. He argues that as a result he was denied the opportunity to argue to the jury that the murder may have been negligently committed rather than intentionally committed. Grube asserts there was substantial evidence presented at trial to support giving the jury the instructions on the lesser included offenses. Specifically, there was evidence the curtain over the window was closed at the time of the murder; there was evidence Amy had moved the furniture around in her room; and, there was testimony by Johnna Sans that Grube told her whoever shot Amy did so by accident. Grube asserts this evidence indicates that the murder may have been literally a "shot in the dark," with the murderer lacking a specific intent to kill.

Idaho Code § 19–2132(b) provides:

(b) The court shall instruct the jury with respect to a lesser included offense if:

(1) Either party requests such an instruction; and

(2) There is a reasonable view of the evidence presented in the case that would support a finding that the defendant committed such lesser included offense but did not commit the greater offense.

In determining when the district court must give the jury an instruction on a lesser included offense, we have stated:

When a district court is requested to give an instruction on a lesser included offense, it must look to *all* of the evidence present-

ed at the trial to determine if there is a reasonable view of the evidence to support the requested instruction. (Citations omitted). Once the district court makes this discretionary determination, it must then look to the language of the proposed instruction and determine whether it is an erroneous statement of law or adequately covered by other instructions. (Citations omitted).

*State v. Thomasson,* 122 Idaho 172, 175, 832 P.2d 743, 746 (1992).

■ There is no doubt that voluntary and involuntary manslaughter are lesser included offenses of first-degree murder, the crime charged by the State. *State v. Atwood,* 105 Idaho 315, 318–19, 669 P.2d 204, 207–08 (Ct. App.1983). Thus, we must determine whether the district court abused its discretion in determining that a reasonable view of the evidence did not support the requested instruction of voluntary or involuntary manslaughter. When reviewing on appeal an exercise of the trial court's discretion, we consider: (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision upon exercise of reason. *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

■ The district court recognized that the determination of whether a reasonable view of the evidence would support the requested instructions involved an exercise of discretion. The court also acted within the outer boundaries of its discretion and consistent with applicable legal principles in determining not to give the jury the requested manslaughter instructions. I.C. § 19–2132. Finally, we agree with the trial court that there is no reasonable view of the evidence which would support giving the jury the requested instructions on involuntary or voluntary manslaughter. The evidence at trial is consistent, if anything, with the crime of second-degree murder, rather than involuntary manslaughter. The evidence regarding Amy's habit of rearranging the furniture in her room and the possibility that the power may have been out or the curtain closed during the murder are consistent with a finding that the murder was not premeditated and deliberate (a necessary element of first-degree murder), rather than a finding that the murder was simply an act of negligence or recklessness. In this case a deadly weapon, a 12 gauge shotgun, was fired into an occupied room. Such an act exhibits a wanton disregard for human life and an abandoned and malignant heart. *See State v. Snowden,* 79 Idaho 266, 313 P.2d 706 (1957). The jury may infer "malice aforethought," upon such a finding, which is an element common to both first and second-degree murder, but not to involuntary manslaughter. I.C. §§ 18–4001, –4002, –4003, –4006. Additionally, there was absolutely no evidence to support an instruction on voluntary manslaughter because there was no indication the murder took place in the "heat of passion." I.C. § 18–4006. Thus, the district court did not abuse its discretion in deciding not to give the requested jury instructions.

## II.

Grube asserts that the district court erred by refusing to suppress the results of a firearm test in which his shotgun was test fired into a deer neck to compare the shot pattern with the shot pattern found on Amy. Grube contends that the trial court should have suppressed the test because it was conducted after the trial had started and thus, he was prejudiced by the new test results which he was not prepared to rebut.

During the course of the investigation Grube's shotgun, a 12 gauge 3″ mag. Model 1200 Winchester was examined in a number of different tests to determine whether it was possible that it was the shotgun that caused Amy's death. The tests attempted to create a shot pattern which was then compared with the pattern on Amy's neck. The shotgun in question was initially tested in 1983 by Peterson at the regional laboratory at Treasure Island, California (Peterson also reviewed all subsequent test firings of Grube's weapon and rendered his expert opinion at trial). Peterson testified at trial, and his report of November 9, 1983, states that he re-created

the crime scene from a description given him by the Idaho Department of Law Enforcement and that he test fired the shotgun into a composite cloth designed to simulate human skin and through a double pane of glass and a curtain to determine whether the shot pattern was similar to that which was found on Amy. Peterson concluded from his examination that Grube's shotgun could be eliminated as a suspect weapon in the murder investigation.

The next tests were performed by Wilkes, an expert for the F.B.I. in firearms and ammunition. He testified that no shotgun fired through a pane of glass, will produce an identical shot pattern because of ricocheting pellets; thus, any test firing through a recreation of the crime scene would be inconclusive and produce differing results. His conclusion, after test firing the shotgun into a target without an intervening object was that a 12 gauge shotgun was capable of producing the shot pattern similar to that which killed Amy, but that no 12 gauge shotgun, including the shotgun in question, could be eliminated as a suspect weapon.

The next series of tests was performed by DLE criminalist, Martin G. Ols (Ols). Ols testified, and his report of October 8, 1991, (the October 8th report supplements and completes his earlier reports) states that he was able to conclude from his analysis of the shot pattern produced in cardboard, that the shotgun in question could not be eliminated as the suspect weapon. On the contrary, Peterson testified, after reviewing and witnessing the test firings performed by Ols into the cardboard, that he was still able to eliminate the shotgun in question as a suspect murder weapon.

Finally, on October 17, 1991, Ols conducted the tests which are at issue here. The shotgun was test fired into a deer neck, which was intended to more closely simulate human skin. As a result of the October 17, 1991 test, Ols was able to conclude that the shotgun in question produced a pattern much like the pattern visible on Amy's neck. Peterson, after reviewing a videotape of the test firing, changed his opinion and stated he was unable to eliminate the shotgun as the murder weapon based upon the similarity in the shot pattern. However, on cross-examination by Grube's attorney, Peterson testified that one firing completely missed the deer neck and that the second was only a partial pattern. Therefore, he concluded that additional testing was needed, but he still could not eliminate the shotgun in question as a suspect murder weapon. When called on direct by Grube's counsel, Peterson was even more emphatic that the results from the deer neck test were no good and were inconclusive.

Grube had Jim Mason (Mason), another firearms expert, review all of the firearm tests conducted with Grube's weapon. Mason was very critical of the FBI tests and testified that although he did not personally test fire the weapon, from his reading of the reports and observations of the video tape evidence, he felt it was extremely unlikely that the fatal shot came from Grube's weapon. However, on cross-examination he agreed that he could not positively eliminate the weapon as the murder weapon. He also testified to the poor quality of the deer neck test.

■ We first note that the test in question was performed on October 17, 1991, the results were published on October 18, 1991, and the trial started on October 16, 1991; therefore, no pretrial disclosure of the test results was possible and the pretrial disclosure rules do not apply. *See State v. Leavitt,* 116 Idaho 285, 290, 775 P.2d 599, 604 (1989). In order for the introduction of late evidence to be reversible error, there must be such prejudice that the defendant's right to a fair trial was denied. *State v. Smoot,* 99 Idaho 855, 859, 590 P.2d 1001, 1005 (1978); *Leavitt,* 116 Idaho at 290, 775 P.2d at 604.

■ While the late disclosure of evidence is always problematic and may very well be unfairly prejudicial, we are not convinced in this instance that Grube was unfairly prejudiced by the late disclosure of the firearm test and shot analysis which was performed on the deer neck. Admittedly, the test was performed and the results made available in an untimely fashion of which we do not approve. Nonetheless, even with all of the tests which were performed on the shotguns, none of the experts who examined the results

were able to state conclusively that Grube's shotgun was the murder weapon. Ols was unable to eliminate the shotgun from consideration as a possible murder weapon. The deer neck test firing only reinforced his conclusion that Grube's weapon fired a shot pattern similar to that found on Amy's neck. Wilkes was able to conclude that the tests in question were inherently unreliable and that no 12 gauge shotgun could be eliminated from consideration as the murder weapon because any such shotgun was capable of producing that shot pattern. Mason, from the outset, felt it was unlikely that Grube's weapon was the murder weapon even after reviewing the deer neck test. The only expert for whom the most recent tests were important was Peterson, who was initially able to eliminate the shotgun in question as a suspect murder weapon, but then changed his opinion and stated he was unable to eliminate it. His change of opinion, however, was also related to his observations of Grube's shotgun and portions of the window frame around Amy's window. From those observations he concluded that Grube's shotgun had unquestionably made certain marks which appeared on both the window frame and the shotgun. Even Peterson agreed that the deer neck test was inconclusive because one test firing missed the deer neck entirely and the other was only a partial pattern.

We cannot say that Grube was unfairly prejudiced by the late disclosure of the deer test results. Grube was clearly aware that virtually all of the State's experts were going to testify that Grube's shotgun could not be eliminated as a suspect weapon; nothing about the deer tests changed that. While Peterson did change his opinion, it was based on more than just the deer tests (his observations of the marks on the gun and window frame) and he clearly expressed his opinion that the deer test results were inconclusive and not well done. Grube's counsel further discredited the deer tests through their own expert, Mason. It would be difficult to imagine what more could have been done by Grube even if the deer test results had been conducted and revealed well before trial. We do not believe that the district court erred by allowing the tests to be admitted as evidence.

## III.

Grube asserts the district court committed reversible error by admitting certain evidence over his objections. First, Grube asserts that the district court erred by allowing Johnna Sans, Juliette Bruner and Chad Perry, all acquaintances of Grube, to testify about conversations they had with Grube in which he made references to or asked about Amy Hossner. Grube asserts that these individuals' statements were irrelevant, impermissible character evidence under I.R.E. 404 and more prejudicial than probative. The district court ruled that the testimony was relevant, not impermissible character evidence governed by I.R.E. 404, and inferentially that the evidence was more probative than prejudicial.

The question of whether evidence is relevant is a question this Court reviews de novo. *Lubcke v. Boise City/Ada County Hous. Auth.*, 124 Idaho 450, 466, 860 P.2d 653, 669 (1993). A determination of whether the probative value is outweighed by the prejudicial effect is left to the sound discretion of the trial court. *Davidson v. Beco Corp.*, 114 Idaho 107, 753 P.2d 1253 (1987). Likewise, a determination of whether the evidence is character evidence under I.R.E. 404 is left to the discretion of the trial court.

Bruner testified that Grube asked her several times about Amy before her death and said he was interested in her. Two years after Amy's death, Bruner testified that Grube called her twice just to talk about how sad he was that Amy had died and to ask if Amy had ever asked about him. Sans testified to meeting Grube at a fraternity party at Idaho State University wherein Grube said Sans reminded him of a girl in Ashton who had been murdered. He then volunteered that the girl's bedroom furniture had been rearranged and that the shots into her room had been an accident; that the shots were just meant to scare her and weren't intentionally supposed to kill her. Sans also testified that Grube continued to pester and threaten her for the next three years, saying that she (Sans) knew too much about the murder and that she must come talk to

him. Perry testified that Grube once asked him to find a girl who would say her name was Amy and would call a Mrs. Hathaway to see if Hathaway liked Grube. The district court ruled that the evidence proffered by Sans, Bruner and Perry evidenced Grube's knowledge of Amy, the murder and the events surrounding the murder. Therefore, the district court deemed that the evidence was relevant and admissible. We agree with the district court's analysis that the evidence proffered by Sans, Bruner and Perry tended to prove matters of consequence to the case, that is, that Grube knew of Amy Hossner and was interested in her. Moreover, the testimony of Bruner and Sans is directly contrary to a transcribed statement given by Grube to the police in which he denies any acquaintance with or interest in Amy other than simply being able to point her out.

■ The district court also ruled that the evidence was not impermissible character evidence under Rule 404, and inferentially that its probative value was greater than its prejudicial effect by allowing the evidence in over Grube's objection. We hold that the district court did not abuse its discretion. The district court found that the proffered testimony was not intended to show Grube acted in conformity with some earlier act. The evidence has absolutely nothing to do with Grube's character or any prior bad acts he may have committed; rather it had to do with what he said and his interest in Amy after the murder.

■ Next, Grube asserts that the district court erred by allowing Amy's father to testify about telephone calls made in the four to six months preceding Amy's death in which the caller would hang up whenever Mr. Hossner answered the telephone. He further testified that there were no more such "hang-up" calls after her death. Grube also argues that the district court should not have allowed Mrs. Hossner to testify that Grube would call the house without any apparent reason and make small talk with her and that Amy had been receiving frightening telephone calls prior to her death. Grube asserts that this testimony was irrelevant and should have been excluded. Finally, Grube contends that the judge did not properly recognize the judge's responsibility as to evidence because he stated that "relevance was to be determined by the jury."

■ We hold that the testimony given by Mr. and Mrs. Hossner regarding the anonymous telephone calls made to the residence and the trivial telephone calls made to Mrs. Hossner by Grube, are at least some evidence for the jury to consider that Grube had some unusual interest in the Hossners and could have been the person making the anonymous calls to bother Amy. Further, although the judge improperly stated that "relevance was to be determined by the jury," the judge later corrected himself and instructed the jury that the court would determine relevance and that it was the jury's job to determine the weight of the evidence. Thus, we find no error either in the trial court's rulings or his comments to the jury.

■ Grube also argues that the district court erred by allowing in evidence Grube's medical and emotional condition. He asserts that the district court improperly allowed irrelevant testimony that Grube suffered from blackouts and memory lapses for which he had received treatment and that the court allowed the jury to hear portions of Grube's police interview in which he was asked questions about seeing a psychiatrist. After reviewing the testimony in question it is clear that Grube was merely asked about his mental and physical health during the course of the police interview. It is not unusual for the police interviewer to establish that there are no physical or mental problems affecting the interviewee which might affect the answers given. The answers given voluntarily by Grube to these questions are relevant to his ability to remember the events surrounding the murder. Grube's police interview is filled with inconsistencies and contradictions and it was, therefore, appropriate for the jury to consider his statements about memory lapses and that he was seeing a psychiatrist for "nerve problems" at work at the time of Amy's death. We find no error in the district court's rulings.

## IV.

Grube next argues that the district court erred by failing to give the jury a limiting

instruction concerning the testimony discussed in Part III given by Johnna Sans, Juliette Bruner and Chad Perry. Grube argues that the evidence was impermissible character evidence, and if allowable, was only admissible for a limited purpose. Thus, he argues that the district court should have given the jury an instruction to advise them of the limited purpose for which the testimony was offered.

Idaho Rule of Evidence 105 states that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." As noted above, the district court did not abuse its discretion in determining the testimony given by Sans, Bruner and Perry was not character evidence; thus there was no reason to advise the jury that they could only consider the evidence for certain limited purposes.

## V.

 Grube contends that the district court erred by not excusing a juror for cause because she had indicated on her juror questionnaire form that one of her children had been murdered in her home. Grube asserts that the juror indicated she could not be a fair and impartial juror, and thus should have been excused for cause.

We have held that the district court has broad discretion to decide whether to remove a juror for cause. *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). The district court in this instance listened to and evaluated the juror's oral responses during voir dire and then determined that she could be an impartial juror. We find no error in the district court's determination that the juror should not be removed for cause.

## VI.

It is Grube's next contention that the district court erred in not allowing into evidence a report of the other murder suspect's (Brood) polygraph examination. This issue arose after Deputy Hillman, a State's witness, made a comment during cross-examination about Grube's inconclusive polygraph ex-

amination. Grube asserts that Deputy Hillman opened up the issue of polygraph examinations and, therefore, Grube should have been permitted to bring Brood's polygraph examination results to the jury's attention.

 The general rule in Idaho is that a polygraph examination is not admissible into evidence absent stipulation by both parties, even if exculpatory. *State v. Fain,* 116 Idaho 82, 86–87, 774 P.2d 252, 256–57 (1989). In this instance, the district court was correct in not admitting Brood's polygraph examination. Deputy Hillman's offhand comment about Grube's test results was at best invited error since it was in response to a question by Grube's counsel. In any event it was not of such magnitude or importance that it required additional testimony about Brood's results. The district court judge then properly instructed the jury to disregard any testimony regarding any polygraph examinations.

## VII.

 Grube asserts that the district court erred by not allowing Stephen Watts, who at the time was a DLE senior criminal investigator for eastern Idaho, to testify regarding evidence obtained about Brood. Grube asserts that Watts would have testified to statements Brood made which caused Watts concern, to the evidence used to secure a search warrant for Brood's home, and to Brood's demeanor during the course of an interview.

We hold there was no error. Grube fully explored evidence concerning Brood's whereabouts during the time of the murder, that Brood owned a shotgun and that Brood was under investigation for the murder. Further, evidence regarding the search of Brood's home during which time the shotgun was seized, was also fully explored. Finally much of the evidence which Grube sought to obtain from Watts was hearsay and no exception has been suggested which would have made this testimony admissible. The district court did not abuse its discretion in not allowing this testimony.

## VIII.

Grube argues that the district court erred in not granting his motion for acquittal made

pursuant to Idaho Criminal Rule 29(a). Grube maintains that the State failed to establish a prima facie case against him, and did not present enough evidence to show that he was guilty of the crime beyond a reasonable doubt.

When a motion for judgment of acquittal has been denied, and the defendant stands convicted, all reasonable inferences on appeal are taken in favor of the prosecution. *State v. O'Campo,* 103 Idaho 62, 67, 644 P.2d 985, 990 (Ct.App.1982). Further, review of a denial of a motion for judgment of acquittal requires the appellate court to independently consider the evidence in the record, and determine whether a reasonable mind could conclude that the defendant's guilt as to such material evidence of the offense was proven beyond a reasonable doubt. *State v. Printz,* 115 Idaho 566, 567 768 P.2d 829, 830 (Ct.App. 1989). After a review of the record, taking all reasonable inferences in favor of the State, we believe the district court did not err in denying Grube's motion for acquittal.

## IX.

Grube asserts the district court erred by failing to allow his expert, Walter Reuter (Reuter), to testify to hearsay evidence regarding the manufacturing process of Remington–Peters shotgun shells which Reuter obtained during a telephone call with a representative of Remington–Peters. Grube alleges that the evidence forms the basis of Reuter's expert opinion regarding the metallurgic composition and integrity of the shot pellets. Grube's counsel felt it was necessary to call Reuter to contradict testimony of John Riley (Riley), an FBI agent assigned to the elemental and metals analysis unit of the FBI laboratory division. Riley had conducted a compositional analysis of the bullet lead from pellets at the crime scene, as well as from some of the shot shells taken from Grube. After conducting the analysis Riley concluded that the pellets "were pretty much all the same." He further opined that the shot shells from which the crime scene pellets came could have come from the same box as the shot shells from Grube; or were from boxes manufactured at the same place on or about the same date.

Reuter was contracted by Grube to perform a metallurgical examination on the lead shot pellets found in Grube's possession, as well as those taken from the murder scene. Grube intended that Reuter testify about: 1) his impressions of F.B.I. agent Riley's metallurgical examination of the shot pellets; 2) his own metallurgical analysis of the shot pellets; and 3) the manufacturing process of shot pellets.

Idaho Rule of Evidence 703 allows experts to testify to hearsay evidence which forms the basis of their expert opinion. *Doty v. Bishara,* 123 Idaho 329, 335–36, 848 P.2d 387, 393–94 (1992). However, after reviewing the record and the offer of proof by Grube's counsel to establish to what Reuter would be testifying and his expertise, we are convinced that Grube wanted Reuter to testify in an area in which he was not an expert and thus hearsay evidence could not be part of his testimony. The district court did not err in excluding this proffered testimony.

The record reveals that Reuter is an expert in metallurgy and fracture mechanics and works for the Idaho National Engineering Laboratory in Idaho Falls. According to Reuter, he is engaged in analyzing the structure, chemical makeup and integrity of metal. In forming his opinions he testified that he often considers and examines the manufacturing process of the metal in question. Thus, Reuter can give his expert opinion on metal analysis, metal composition and metal integrity and can also testify to hearsay evidence which forms the basis of his expert opinion, including the manufacturing process of the shot if it is a basis for his expert opinion.

In this instance, Reuter's analysis of the shot pellets was not performed in time for trial and he was therefore unable to testify as to his metallurgic analysis of the shot pellets. At a hearing outside the presence of the jury prior to Reuter's testimony, Grube's counsel conceded: "We were not able to finish the elemental analysis prior to trial. So, all that leaves is what Mr. Reuter knows about the manufacturing process." Thus, by Grube's counsel's own admission, Reuter's testimony was to be limited to his impressions of F.B.I. agent Riley's report, and the information he

gathered from Remington–Peters regarding the manufacturing of the shot pellets. From an examination of the offer of proof, it is apparent that Reuter's testimony would have been cumulative to that of F.B.I. agent Riley. Reuter would have agreed with Riley that the shot pellets found at the murder scene could have come from the same batch, lot or box of shot pellets found in Grube's possession and that the shells from Grube could be similar to other shells manufactured on or about the same day. All that was left for Reuter to testify to was the manufacturing process of the Remington–Peters shotgun pellets. Grube's counsel stated that Reuter would be testifying to:

> the manufacturing process that the other witness, the FBI witness is not able to, specifically how many shells could have been made that day, how many machines were used for making the shells, what is the output of one of those machines in a given day and what is its relationship to the Defendant's shell on any given day.

However, this evidence no longer formed the basis of his expert opinion because he was no longer testifying regarding the analysis, composition or integrity of the shot pellets. Reuter is not an expert in the manufacturing process of shotgun shells; thus, the evidence he received through a telephone call to the manufacturer was hearsay to which Reuter was not qualified to testify. The district court did not err by disallowing Reuter's testimony.

### X.

Finally, Grube argues that even if his alleged errors individually do not warrant a reversal, there was an accumulation of irregularities which in aggregate show that Grube did not receive a fair trial. Grube asserts that the cumulative error doctrine should be applied so as to grant him a new and fair trial. Because we have concluded that the district court did not commit any errors, the cumulative error doctrine will not be applied to afford Grube a new trial.

### ALLEGED ERRORS AT SENTENCING

### XI.

Grube asserts that there are numerous errors in the presentence report, and that those errors mandate a remand for new sentencing. First we note that while Grube objected to these errors, the district court did not ever rule on Grube's objections and Grube did not request a ruling from the district court prior to sentencing. We have held that we will not review an alleged error on appeal unless the record discloses an adverse ruling which forms the basis for the assignment of error. *State v. Fisher,* 123 Idaho 481, 485, 849 P.2d 942, 946 (1993); *Dunclick, Inc. v. Utah–Idaho Concrete Pipe Co.,* 77 Idaho 499, 502, 295 P.2d 700, 702 (1956). Grube now asserts that the errors in the presentence report which he brought to the attention of the district court, but from whom he did not seek a ruling, necessitate a remand. He argues that he could not effectively challenge the presentence report and did not know what the district court was relying on to pass sentence. However, because Grube did not ask for a ruling on his objections, the issues raised by Grube are not properly before this Court.

■ Furthermore, the district court stated in its denial of Grube's Rule 35 motion, that it recognized it had not made rulings upon the alleged errors in the presentence report, but that it had not relied upon any of the information that was allegedly erroneous in passing sentence. Thus, even if there was error in not striking the objectionable information, the district court, by not relying upon any of that evidence, rendered any error harmless.

Grube also alleges numerous other issues concerning the imposition of the life sentence without the possibility of parole. First, Grube asserts that the district court ignored mitigating evidence. To the contrary, the district court, in its sentencing memorandum, clearly set out the reasons he imposed a life sentence without the possibility of parole, examining both mitigating and aggravating factors. Thus, there is no basis for Grube's objection.

■ Grube also asserts that the district judge imposed a disproportionately harsh sentence upon Grube when his case is com-

pared with other first-degree murder cases. A proportionality analysis is not part of the review of a life sentence. The test is whether the sentence is reasonable in light of the goals of sentencing. *State v. Enno*, 119 Idaho 392, 409, 807 P.2d 610, 627 (1991). The record reflects the district court properly considered all of the goals of sentencing: protection of society, deterrence, rehabilitation and punishment. *Id.* We find no error in the sentence imposed.

Next, Grube contends that the district court erred by referring to Grube's continuing assertion of his innocence and by treating that as an aggravating factor when imposing sentence. The district court's sentencing memorandum reveals that the district court considered Grube's assertion of innocence only when it evaluated the possibility of Grube's rehabilitation. Grube's assertion of his innocence was not the sole factor in determining the appropriate sentence, rather it was only a part of the determination of whether Grube could be rehabilitated. Thus, the district court did not err. *See State v. Lawrence*, 112 Idaho 149, 157, 730 P.2d 1069, 1077 (1986).

Finally, Grube asserts that the district court erred by denying his Rule 35 motion for a reduction of sentence. We have held that a court's grant or denial of a Rule 35 motion is subject to the discretionary standard of review. *State v. Lavy*, 121 Idaho 842, 845, 828 P.2d 871, 874 (1992). After reviewing the record we are able to say that the district court did not abuse its discretion in denying Grube's Rule 35 motion for reduction of sentence.

## CONCLUSION

We find the district court committed no errors in either the trial or in sentencing Grube to a life sentence without the possibility of parole. Thus, we affirm the conviction, sentence and the district court's denial of the Rule 35 motion.

McDEVITT, C.J., JOHNSON and SILAK, JJ., and REINHARDT, J. Pro Tem., concur.