995 P.2d 794

**Rauland J. GRUBE, Petitioner–Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 24854.

Supreme Court of Idaho,
Pocatello, September 1999 Term.

Jan. 7, 2000.
Rehearing Denied March 3, 2000.

Rigby, Thatcher, Andrus, Rigby, Kam & Moeller, Rexburg, for appellant. Gregory W. Moeller argued.

Hon. Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

WALTERS, Justice.

This is an appeal from the denial of a post-conviction relief application filed with regards to Rauland Grube's conviction for first-degree murder in the 1983 death of Amy Hossner in Ashton, Idaho. The order denying relief is affirmed.

## BACKGROUND

Amy Hossner was murdered while she slept in her bedroom in the basement of her parent's home in the early morning hours of June 4, 1983. She was killed by a single shotgun blast through a window above her bed. Rauland Grube was tried for the crime in October of 1991, after information came to light placing Grube at Amy Hossner's house on the night of the murder. Brenda Fredricksen Briggs, a witness who did not come forward until 1991, testified at trial that

shortly after the murder, Grube had approached her and told her that he had a crush on Amy and had spoken to Amy through her bedroom window the night Amy was murdered. Briggs also testified Grube told her that when Amy failed to meet him several hours later, he went back to her house and looked in the window, whereupon he told Briggs that he had "never seen so much blood in his life." Although Grube did not testify, a tape-recorded interview of Grube which had been conducted by the police in 1991 was played for the jury, in which Grube said that the story he had told Briggs was a lie. There was testimony relating to the various tests performed by firearms experts on Grube's weapon, a shotgun, both in 1983 and in 1991. The jury found Grube guilty of first-degree murder in the death of Amy Hossner, and he was sentenced to life imprisonment without the possibility of parole. The judgment of conviction and the sentence were upheld by this Court on direct appeal in *State v. Grube,* 126 Idaho 377, 883 P.2d 1069 (1994).

In 1994, while Grube's appeal from the judgment of conviction was pending, Lynn Gifford approached defense counsel. Gifford indicated that he was the person who had first told Grube that Amy Hossner had been murdered, and that although he had been interviewed by the police in 1991, he had not been called to testify at Grube's trial. In their conversation with Gifford, defense counsel learned information (1) that Grube had reacted with genuine surprise and sadness to the news of Amy Hossner's death, and (2) that Gifford had reported seeing Ashton police officer Stephen Brood—an early suspect in this crime—driving a police car within a few blocks of Amy Hossner's house at approximately 2:30 a.m. on the night of the murder. This information had been communicated to the police investigator in 1991 but was never disclosed by the state to the defense, prompting counsel to seek post-conviction relief on Grube's behalf from the district court.

In his application for post-conviction relief, Grube asserted that he was entitled to a new trial because he had been denied due process by the state's failure to disclose exculpatory information contained in Gifford's interview with the investigator in 1991. The Gifford information led defense counsel to discover that Ashton police logs recording activity the night of the murder appeared to have been altered. Consequently, Grube also alleged that he was entitled to a new trial on the basis of that evidence which only came to light subsequent to the trial. After denying the state's motion to dismiss Grube's request for post-conviction relief, the district court conducted an evidentiary hearing on the application. According to the state, the police logs in question could not be located and were unavailable for the defense to examine whether they corroborated Gifford's story and supported an investigator's testimony that Chief of Police Sebek, the only other Ashton police officer, had gone home before midnight the night that the murder took place. Just days before the scheduled post-conviction hearing, the police logs were found, necessitating a continuance to allow examination of the logs by forensic experts.

The district court denied Grube any relief on his post-conviction application. The district court made the following findings: (1) that even if it were proven that Officer Brood had written on the log of June 3, 1983, such evidence does little more than prove that he had access to the logs and does not provide any solid footing to conclude that Officer Brood may have murdered Amy Hossner or had access to the police vehicle on that date; (2) that Gifford's observation, even assuming it was accurate, was only marginally relevant in view of the other evidence presented at trial; (3) that Gifford's testimony fails to cast any different light on the trial which would undermine confidence in the jury's verdict; (4) that the additional evidence did not contradict any physical evidence and failed to impeach the testimony of any witness critical to the state's case or to weaken the overall case against Grube; (5) that the post-conviction evidence failed to establish the reasonable probability of a different verdict; and (6) that Gifford's conclusions regarding Grube's reactions upon learning of Amy Hossner's murder would not be admissible over an appropriate objection. Grube filed a notice of appeal to this Court.

## ISSUES ON APPEAL

1. Did the state violate Grube's due process rights by failing to disclose *Brady* evidence in the form of Lynn Gifford's interview with the state investigator?

2. Did Grube show that he was entitled to a new trial on the basis of newly discovered evidence?

3. Did the state's failure to disclose the Gifford interview deny Grube the right to a manslaughter instruction at his trial on the murder charge?

4. Did the state's failure to disclose the Gifford interview deny Grube a fair proceeding at the time he was sentenced?

## STANDARD OF REVIEW

■ An applicant for post-conviction relief bears the burden of proving, by a preponderance of the evidence, the allegations on which the applicant's claims are based. I.C.R. 57(c); *McCoy v. State,* 129 Idaho 70, 72–73, 921 P.2d 1194, 1196–97 (1996); *Clark v. State,* 92 Idaho 827, 830, 452 P.2d 54, 57 (1969). Where there is competent and substantial evidence to support the district court's decision made after an evidentiary hearing on an application for post-conviction relief, that decision will not be disturbed on appeal. *McCoy, supra; State v. Pizzuto,* 119 Idaho 742, 778, 810 P.2d 680, 716 (1991). The credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence are all matters solely within the province of the district court. *Larkin v. State,* 115 Idaho 72, 764 P.2d 439 (Ct.App.1988).

## DISCUSSION

### A. *Brady* violation.

■ Grube contends that the state withheld evidence favorable to him upon a discovery request by the defense. Only after the trial did Grube learn that the state's investigator had interviewed Lynn Gifford in 1991 at which time Gifford provided information that contradicted the testimony of the state's primary witness against Grube, put into question the alibi of the other suspect (Brood), and supported Grube's theory of defense that someone else had killed Amy Hossner. This evidence, commonly referred to as *Brady* material, is required to be disclosed if the police or prosecutor possessed the evidence.

■ Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution is bound to disclose to the defense all exculpatory evidence known to the state or in its possession. The duty to disclose encompasses impeachment evidence as well as exculpatory evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985). In the situation where a general request for *Brady* materials is made and when the exculpatory information in the possession of the prosecutor may be unknown to the defense, the reviewing court must look to the whole record and determine whether "the omitted evidence creates a reasonable doubt that did not otherwise exist." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342, 354 (1976).

> If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* at 112–13, 96 S.Ct. at 2402, 49 L.Ed.2d at 354–55.

■ Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d at 218. Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; see also *Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 1565–66, 131 L.Ed.2d 490, 505–06 (1995). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* As

the Supreme Court elaborated in *Kyles*, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434, 115 S.Ct. at 1565, 131 L.Ed.2d at 505.

In a recent decision, the United States Supreme Court further explained the holding of *Kyles*, stating that "the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) [citations omitted]. Therefore, we examine the withheld evidence in Grube's case to determine whether it substantially undermined confidence in the outcome of the jury's verdict, thus entitling Grube to a reversal of his conviction and a new trial.[1]

Lynn Gifford testified at the post-conviction proceeding that he had been the one to first inform Grube that Amy Hossner had been found murdered in her home. Gifford testified that he learned of the murder the following morning at a convenience store in Ashton where he went on his break from the potato warehouse where he and Grube worked. When he returned to work, he told Grube and others of the murder that had taken place the night before. Gifford testified that Grube fell to his knees, exclaiming "Oh, God!" and that he appeared to be sincerely upset and sad upon learning of Amy's death. Gifford then testified that Grube left work, feeling sick, and went home thereafter. In addition to this information, Gifford testified that he had also told the state investigator in 1991 that, on the night of the murder, he had seen Steven Brood pass by in the police vehicle between 2:00 and 2:30 a.m. He

testified that the investigator did not want to hear about Officer Brood, only about Rauland Grube.

*1. Grube's reaction to news of the death of Amy Hossner.*

Grube argues that the district court erred when it found that the contents of the Gifford interview were only marginally relevant, did not impeach the testimony of any witness critical to the state's case, and did not undermine confidence in the jury's verdict. Grube contends that Gifford's testimony about Grube's reaction to the news of Amy Hossner's death would have provided the defense with evidence to rebut Brenda Fredericksen Briggs' testimony at trial which suggested that Grube had been with Amy the night of the murder and had personal knowledge that she had been killed.

■ The information contained in the statement from Gifford that was withheld from Grube was information which the jury had already heard when the tape of Grube's interview with the police was played during the trial. On the tape, Grube indicated that it was Gifford who had told him about the murder and that the news had made him sick such that he did not return to work after his break. For Gifford to testify to these same observations would present cumulative evidence. When nondisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs. *Spence v. Johnson*, 80 F.3d 989 (5th Cir.1996); *United States v. Marashi*, 913 F.2d 724 (9th Cir.1990); *United States v. Page*, 828 F.2d 1476 (10th Cir.1987). This evidence from Gifford, had it been disclosed, would not have led to a different result and would not have cast the entire case in such a different light as to undermine confidence in the verdict.

*2. Seeing Officer Brood on the night of the murder.*

Grube argues that the Gifford evidence relating to Officer Brood's whereabouts at

1. In addition to asserting his right to a new trial under *Brady*, Grube also requested a new trial pursuant to the state constitution and I.C.R. 16. We do not address these requests, only mentioned in his appellate brief, which Grube failed

to argue or support with authority. *See Davis v. Parrish*, 131 Idaho 595, 599, 961 P.2d 1198, 1202 (1998), *citing Smith v. J.B. Parson Co.*, 127 Idaho 937, 945, 908 P.2d 1244, 1252 (1996).

the approximate time of the murder suggested that Brood may have committed the murder. Grube claims that the withheld evidence was material because it undermined the testimony of the state's "Brood alibi" witness (Investigator Watts) who testified that Brood reported spending the night of the murder at his girlfriend's house in Ashton until 1:00 a.m., after which he went home and stayed there the rest of the night. The evidence also called into question the police logs from the night of the murder, which appeared to have been altered and which supported the defense theory that Brood had committed the murder and that his involvement was being covered up.

This information was explored at the hearing on the post-conviction application. Gifford gave details about seeing Officer Brood on the night of the murder. He indicated that he was sixteen years old in June of 1983. He related that he was in his car with a friend, visiting with two other friends in another car, in the parking lot of the REA store across from the Circle K in Ashton between 2:00 and 2:30 a.m. when he noticed a police vehicle approach from the west on Idaho Street, then turn north on Seventh Street. Gifford testified that when the police car stopped at the stop sign, Gifford could see that it was Officer Brood in the vehicle which was lit by the street light. The officer looked at the cars with the teens, then left and was not seen again that night which, according to Gifford, was unusual because the police usually stayed around until the teenagers dispersed and went home. Gifford testified that he had no doubt that it was Officer Brood in the police car, whom he not only saw and recognized but who, in terms of physical size was a much smaller man than Chief Sebek, the only other policeman on the Ashton police force.

Chief Sebek testified in the post-conviction proceeding that he, not Officer Brood, was on duty the night of the murder and that he had ended his shift at 2:30 a.m. He testified that he had filled out the log sheets at the police station showing that he was the officer on duty and that his shift ended at 2:30 a.m. Chief Sebek also related that he had written a traffic ticket at 1:59 a.m., again showing that he, not Officer Brood, was on duty and patrolling in the town's only police car.

The district court concluded that the information from Gifford, which the court found had been suppressed by the state, was not material in view of the other evidence upon which Grube was convicted. Even if believed, Gifford's observations only established that Officer Brood was out later the night of the murder than he claimed and that he and Chief Sebek either were mistaken or lied about their activities that night. Although the defense argued that the jury could have inferred from Gifford's testimony that Officer Brood was involved in the murder, the testimony does not exonerate Grube. Gifford's testimony does not significantly impeach the truthfulness of any prosecution witness who provided incriminating evidence against Grube at his trial, nor does it impair the incriminating quality of such testimony. Gifford's testimony did not contradict the physical evidence of tool marks on Grube's gun and the window through which the fatal shot was fired or the pellets in Amy's body that came from the same batch as the unfired shells that were found in Grube's possession. Those items of evidence do not change regardless of Gifford's version of the events and any records shown in the police logs. Nor does the Gifford testimony weaken the overall case against Grube, which included testimony from a parade of witnesses about Grube's obsession with Amy Hossner and statements made by Grube that Amy had rearranged the furniture in her bedroom and that the shooter never meant to kill her. The evidence from Gifford, which was withheld, does not as a matter of law raise a reasonable doubt as to Grube's guilt that did not otherwise exist in the evidence presented at Grube's trial, *see United States v. Buchanan*, 891 F.2d 1436, 1445 (10th Cir.1989), which compels us to uphold the district court's ruling on materiality. Accordingly, the nondisclosure of the Gifford testimony, because it was not material and would not have changed the outcome of the trial, does not entitle Grube to post-conviction relief for the alleged *Brady* violation.

### 3. The police logs from the night of the murder.

■ Until the Gifford testimony was developed, the relevance of the police logs for the night of Amy Hossner's murder was not readily apparent. The logs were examined to verify which officer was on duty and which officer had filled in the daily log and could have been used to argue to the jury that not only did Officer Brood commit the murder, but he was involved in a coverup to hide his involvement. The state argues that only the testimony of the forensic expert who examined the police logs, not the logs themselves, could be considered exculpatory. Since the expert testimony that related to the police logs was not in the possession of the prosecution, the state properly asserts that such evidence could not be deemed withheld or in any way suppressed by the state in contravention of *Brady* principles.

■ We complete our analysis of the claimed *Brady* violation by addressing whether with due diligence the defense could have obtained Gifford's testimony. The state argues that because Grube had mentioned Gifford in his interview with the police in January of 1991, the defense could have obtained Gifford's testimony through the exercise of due diligence. Although the state is not required to furnish a defendant with exculpatory evidence that is fully available through the exercise of due diligence by the defendant, *United States v. McMahon*, 715 F.2d 498, 501 (11th Cir.1983), there is no evidence in the record to suggest that Grube had any knowledge that Gifford had been questioned and the interview recorded by the state investigator. The state's excuse for not providing Grube with the Gifford interview is, therefore, without merit.

### B. Newly discovered evidence.

■ As another basis for requesting a new trial, Grube argued that Gifford's testimony and the evidence of tampering of the police logs was newly discovered evidence. The police logs were shown to Gifford at the time of his 1991 interview in order to attempt to impeach his observation of Officer Brood in the police car between 2:00 and 2:30 a.m. the night of the murder in the vicinity of the Hossner home. Examination by forensic document experts revealed a number of discrepancies and notably, that at least two persons had recorded information on the log for the night of the murder. The defense expert, Mr. Hale, concluded that the mileage total for the night of the murder appeared to have been written by Brood and not Chief Sebek who testified that he was on duty and that he completed the log record for the night in question. Unique to this night's log, the final time entry "2:30" appeared to be written so that the last two digits avoided a hole which was punched in the document; all other entries by a hole show that the hole punch went through the entries. Grube contends that this evidence strongly suggested that the police records were doctored thus corroborating Gifford's testimony and supporting the defense theory that Brood was responsible for the murder.

■ Idaho Code Section 19–4901(a)(4) authorizes post-conviction relief upon a showing that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice. To be granted a new trial on the ground of newly discovered evidence, a defendant must demonstrate that the newly discovered evidence was unknown to the defendant at the time of trial; the evidence is material, not merely cumulative or impeaching; the evidence will probably produce an acquittal; and the failure to learn of the evidence was due to no lack of diligence on the part of the defendant. *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976).

The district court in this case concluded that Gifford's testimony was insufficient to refute the other evidence of Grube's guilt and thus was not material. The district court also dismissed the relevance of the log changes "in the mix" when it concluded that the post-conviction evidence failed to establish a reasonable probability of a different result. Having affirmed the district court's materiality finding under the *Brady* analysis above, we conclude that this same evidence cannot meet the *Drapeau* standard which requires that the new information or evidence "will probably produce an acquittal,"

which is a higher standard. The district court did not err in denying Grube a new trial on the basis of newly discovered evidence.

## C. Miscellaneous issues.

█ Grube contends on appeal that the state's failure to disclose the Gifford testimony denied him the right to a manslaughter instruction at trial and the right to a fair sentencing. Our holding that the post-conviction evidence would not have changed the outcome of the case renders these questions moot. Moreover, the district court's denial of a manslaughter instruction at trial and claimed errors related to sentencing were raised and disposed of, or should have been, in the direct appeal and are not subject to further review by this Court. *See Paradis v. State,* 110 Idaho 534, 716 P.2d 1306 (1986); *State v. Ruth,* 102 Idaho 638, 637 P.2d 415 (1981).

## CONCLUSION

Lynn Gifford's interview with the state investigator in 1991 was improperly withheld by the state in response to the defense's request for exculpatory information under *Brady.* The withheld evidence, however, does not raise a reasonable doubt about Grube's guilt that did not previously exist and would not, as required for newly discovered evidence, likely produce an acquittal. Therefore, the district court properly concluded that Grube was not entitled to relief under the standards applicable to undisclosed evidence or newly discovered evidence.

The district court's order denying Grube's application for post-conviction relief is affirmed.

Chief Justice TROUT, and Justice SILAK, concur.

Justice KIDWELL, dissenting.

Upon review of withheld evidence, doctored police logs, evidence that suspiciously appeared after several years, and the absence of convincing direct proof, my confidence in the original jury verdict has been undermined. Mr. Grube did not receive the fair trial to which he is entitled under our constitutional system. Therefore I respectfully dissent.

It should be noted at the outset that the evidence at trial linking Grube to Amy's shooting was scant. The prosecution's case rested on two grounds. First, the prosecution showed that Grube, who had some psychological problems, obsessed about Amy for years *after* her death.[2] Second, the prosecution attempted to link Grube's shotgun to the scene of the shooting. It attempted to make this link by demonstrating that Grube's shotgun had contacted the trim around Amy's window and by showing that the shot pattern produced by Grube's gun was consistent with the shot pattern on Amy.

Key to the prosecution's case was evidence that Grube's shotgun had scraped against the aluminum trim of Amy's window frame. Both the transfers on the gun barrel and the tool marks on the window trim were obvious to every person who examined the evidence in 1991. Investigators had removed the window trim from the Hossners' house late in 1983. The trim was sent to Edward Peterson, a firearms expert at the Bureau of Alcohol, Tobacco, and Firearms (ATF), in November 1983. In 1983, several persons had noticed that the trim had a dent in it. *For eight years, however, none of the city, county, state, or federal investigators working on the Hossner case noticed either the tool marks on the aluminum trim or the aluminum and paint transfers on Grube's shotgun.* Mysteriously, investigators discovered these marks only in 1991 after Briggs's statements to police made Grube a suspect again.

---

2. The prosecution introduced evidence that Amy had, for several months before her death, received strange and distressing phone calls from a man. The prosecution failed to show, however, that Grube made these calls. Indeed, Briggs testified that Amy had told her, in the months before her death, that a guy named Jack was calling her on the telephone and scaring her. It

is undisputed that Amy and Grube attended the same church and knew each other. Mrs. Hossner testified that Grube made four to six "pointless" phone calls to her in the six months before Amy's death, but he did not mention Amy during these calls. It is difficult to understand why Grube identified himself to Mrs. Hossner if he was concealing his identity from Amy.

The defense's theory was the police manufactured this evidence sometime after 1983 to pin the blame on Grube and exonerate Steven Brood, an Ashton police officer and an original suspect. Abundant evidence supported this theory:

- In 1983 or 1984, Idaho investigators specifically requested that ATF firearms expert Peterson inspect the suspect guns for brown paint residue. In reply, Peterson told State investigator Jim Mason that he did not find any brown paint on the barrels of any of the suspect guns.

- Peterson examined Grube's shotgun again after the aluminum and paint marks were found in 1991. He testified that he could not reproduce the tool marks by recoil, that the shotgun would have to pivot in an extremely unusual pattern on recoil to receive the transfer, and that he could reproduce the marks on the shotgun only by mechanically scraping the gun barrel with the window trim.

- Ashton Police Chief Sebek testified that he did not see the tool marks on the window frame trim until 1991. He "couldn't believe that [he] didn't see them before." He was surprised to see the tool marks at Grube's preliminary hearing because they looked fresh and he'd never seen them before. Sebek conceded that tool marks on the trim were not visible in pictures taken in 1983.

- Bob Perez, who joined the Ashton police force in June 1983, looked at Grube's gun when it was handed to the police in 1983. He never saw transfers on the barrel before 1991.

- Burt Bates, the lead investigator for Fremont County, did not notice any unusual marks, dents, or scratches on Grube's gun when police took possession of the gun in 1983. At that time, he noticed the dent in the window trim, and a place where brown paint was scraped off the trim, but he first saw tool marks in the window trim in 1991.

- State investigator Stephen Watts, who left State employ in 1985, knew of the dent in the window trim but never knew of transfers on Grube's gun or tool marks on the window frame.

- Kurtis Hillman, a Fremont County deputy who took charge of the Fremont County evidence after Bates left the force in August 1988, received Grube's shotgun and the window trim back from the ATF in November 1988. The first time he noticed tool marks on the window trim was in January 1991.

- John Lewoczko, an FBI tool marks examiner, stated that it was impossible to determine when the tool marks were made on the window trim. David Nichols, an FBI materials analyst, stated that there was no way to determine how long the brown paint was on Grube's gun barrel.

In addition, the evidence linking the shot pattern of Grube's gun to the shot pattern at the scene was inconclusive at best. The shot that killed Amy went through two panes of glass and a curtain. In 1983, ATF firearms expert Peterson test-fired Grube's shotgun and the two shotguns of Brood. Peterson conducted the test firings through two panes of glass and a curtain. When Peterson compared the shot patterns from his test firings to the pattern in Amy's room, he eliminated Grube's shotgun as the murder weapon but could not eliminate Brood's two guns. When the State began reinvestigating Grube in 1991, its firearms examiner conducted four series of test firings, again using intervening objects. Peterson opined that the State's first three tests were consistent with the results of his own 1983 test firing. On the basis of the State's fourth test on deer necks, conducted *during* the trial, Peterson stated that he could not eliminate Grube's gun, but he emphasized that the pattern differed from the shot pattern on the victim and another test shot was needed. Even though Peterson had testified for the State, the prosecution brought in an FBI firearms expert, Gerald Wilkes, to refute Peterson's equivocal testimony. Wilkes opined that it was not possible to reproduce shot patterns through intervening objects, and thus that it was unreasonable for Peterson to eliminate Grube's gun on the basis of test firings done through glass. However, Wilkes ultimately

stated that it was not possible to eliminate *any* shotgun as the murder weapon and stated that the shot pattern from his own test firing had "no relevance to the Defendant."

No evidence placed Grube near the scene on the night of the shooting. One neighbor testified to hearing a shotgun blast at 4:24 a.m. the morning of the shooting, followed within a few minutes by a souped-up vehicle starting up and driving off. The prosecution did not attempt to link Grube to any vehicle. Although the State provided some evidence that Grube sometimes walked around town late in the evening, it provided no evidence of Grube ever driving. Grube introduced abundant testimony that he had no access to any vehicles and that none of the family vehicles were "souped-up." No one saw Grube either walking or driving on the night of the shooting. In addition, Grube presented three witnesses who testified that he was in his room, along with his two brothers, from 11:00 p.m. on the night before the shooting until 7:00 a.m. the following morning, and that it was extremely difficult to sneak out of the house unnoticed by his father and brothers.

Further, fingerprint evidence tended to exonerate Grube. On the night of the shooting, electricity in the Hossners' house (but not elsewhere in the neighborhood) was off for forty-five minutes. The electrical box for the Hossners' house was directly outside Amy's window. Seven fingerprints were lifted from the electrical box. Six prints were from persons involved in the investigation, but one suspicious partial print was on the edge of the electrical box. Testifying for the State, fingerprint expert Robert Kerchusky testified that the print was negative as to Grube.

Here, the State withheld evidence that its investigator, Scott Birch, had interviewed Lynn Gifford, who had impeaching and exculpatory information. Gifford impeached the testimony of Brenda Fredrickson Briggs, the witness whose testimony placed Grube outside Amy's bedroom shortly after the shooting. Gifford testified to telling Birch that he had been the person to first inform Grube that Amy had been shot, and that Grube reacted as though he were sincerely surprised at the news. Gifford's testimony also cast serious doubt on Brood's alibi. Gifford testified to telling Birch that he saw Brood driving the Ashton patrol car between 2:00 and 2:30 a.m. (shortly before the time of the shooting) in the vicinity of the Hossners' house. Gifford noted that Brood departed from his usual late-night routine in dealing with juveniles. He emphasized that he knew both of Ashton's police officers well by sight and that he had clearly recognized the officer in the patrol car as being Brood. As a direct result of Gifford's testimony, defense counsel reexamined prosecution documents. This led to the discovery that police logs for the night of the shooting had been altered.

In *Brady v. Maryland*, the U.S. Supreme Court held, "[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963). The duty to disclose encompasses impeachment as well as exculpatory evidence, and evidence known only to police as well as that known by prosecutors. *Strickler v. Greene*, 527 U.S. 263, 275, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286, 301 (1999). The U.S. Supreme Court recently clarified:

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Id.*

To show prejudice, it is not enough to show "that it made [a defendant's] conviction more likely" than if the withheld evidence had been used, or that "discrediting [a witness's] testimony might have changed the outcome of the trial." *Id.* at 279, 119 S.Ct. at 1952, 144 L.Ed.2d at 291. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419,

34

434, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490, 505 (1995)).

In light of the weak evidence linking Grube to the shooting, the State's suppression of Gifford's testimony, along with the newly discovered evidence uncovered as a result of his testimony, was prejudicial to Grube. Gifford's testimony placed Brood near the scene shortly before the shooting. It directly contradicted the alibi that had Brood leaving his girlfriend's house at 1:00 a.m. and spending the rest of the evening at home, far removed from the Hossners' house. More importantly, however, Gifford's testimony directly supported the defense's theory of a police coverup. It directly contradicted Chief Sebek's testimony about his activities on the night of the shooting. Gifford's information led directly to the discovery that the Ashton police patrol logs for the night of the shooting had been deliberately altered. The doctored logs lend substantial credence to the defense's assertion that the police manufactured the tool mark and transfer evidence directly linking Grube's shotgun to the window of Amy's bedroom.

In conclusion, it is my opinion that Rauland Grube was convicted of murder based on possibly doctored physical evidence, on inconclusive test-firing evidence, and on evidence that Grube had an unhealthy obsession with Amy after her death. Gifford's direct evidence impeached several key prosecution witnesses, put another suspect, who was a policeman, near the murder scene, and led to the discovery that the police logs for the night of the shooting had been doctored. The possibility that police lied on the witness stand and doctored the police logs undermines the validity of the physical evidence linking Grube to the shooting. Combined with the weakness of the other evidence presented in the trial, this is enough to undermine confidence in the original verdict. Therefore, the State's suppression of the Gifford evidence meets *Strickler*'s prejudice prong, and the case should be sent back to give Mr. Grube a fair trial.

Justice SCHROEDER concurs.